## John Reeves v. The State.

### No. 2992.    Decided November 23, 1904.

**1.—Murder—Jury—Challenges.**

A defendant cannot urge a reversal for supposed erroneous rulings of the court in not sustaining causes of challenge, unless some objectionable juror has been taken on the jury.

**2.—Same—Evidence—Defendant's Declaration.**

Where the defendant was not under arrest and after making some statements to the witness about his people, he left the impression that his wife had deserted him and run away with another man, and when subsequently her dead body was found buried in defendant's garden, he being accused of the murder, and in seeking for the motive of the killing, evidence was introduced to show there was no jealousy existing between the defendant and his wife, there was no error in admitting defendant's declaration to said witness during said conversation with said witness that his old daddy and mamy were parted now on account of the former being jealous of her, but defendant was not built that way.

**3.—Same—Confessions—New Trial—Objections Too Late.**

Where objections to defendant's confessions are urged for the first time in his motion for new trial, they come too late; but aside from this, the objections were without merit, as the defendant had been properly warned.

**4.—Same—Change of Venue—Mob Violence.**

Where the evidence justified the conclusion that there was no mob organized or attempted to be organized in the court of the trial of the defendant for the murder of his wife, and that he was placed in the jail of a neighboring county for safe-keeping, the motion for change of venue on account of prejudice, etc., in said county of trial was correctly overruled.

**5.—Same—Fact Case.**

See opinion for evidence held sufficient to sustain a verdict with the death penalty against the defendant for the murder of his wife.

**6.—Same—Transcript—Motion for Rehearing.**

Where appellant contends in his motion for rehearing that a certain witness did not testify and the transcript shows that he did, the opinion of the Court of Criminal Appeals which cites him as a witness testifying on the trial is sustained.

Appeal from the District Court of Red River.   Tried below before Hon. Ben H. Denton.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*R. P. Lewis* and *J. C. Hodges,* for appellant.—The court below erred in overruling appellant's motion for a change of venue on account of the great prejudice existing throughout Red River County, Texas, against him, so that appellant could not obtain a fair and impartial trial under the Constitution and laws of Texas, and the Constitution and laws of the United States of America, because the State relied at the time and on the trial of the motion for a change of venue on purely negative testimony of the following named witnesses:   L. R. Latimer, W. M. Ma-- haffey, M. C. Scaff, G. W. Coleman, J. E. Whitmore, John Hurt, J. G.

Wright, W. H. Trapp, to overcome the positive testimony of Rice Reeves, J. L. Crawford, J. S. Terry and John Reeves, witnesses for appellant, who swore that they had talked to men from every portion of the county and that they had heard threats against appellant from every portion of Red River County, and that they had heard men threaten to mob appellant in the courthouse during the trial of the cause of the change of venue, and had heard men all over Clarksville, Texas, and all around the courthouse yard threaten to mob appellant, and that these men lived all over Red River County, Texas, and that a great many of them were summoned as jurors on the venire; and appellant's said witness had had an opportunity to see and hear men talk of this case, they had made numerous trips to and through the county since the alleged homicide in the interest of appellant. Randell v. State, 34 Texas Crim. Rep., 43; Gallahor v. State, 50 S. W. Rep., 388; Hallon v. State, 38 Texas Crim. Rep., 475; R. H. Moore v. State, from Lamar County, decided March, 1904.

Because the court erred in admitting the pretended confession of appellant to Sheriff Dinwiddie and James Terry, because his pretended confession was not voluntary, but was obtained, if obtained at all, by stratagem and a subterfuge on the part of the officers, by decoying appellant to come down stairs where they were for the sole purpose of compelling appellant to make the so-called voluntary confession, and he really did not know what he was doing just after a mob had chased him and the officers of Red River County out of Red River County to Paris, Texas, to try to hang appellant, and that he was so unnerved and so frightened that he did not know what he was saying, and what he did say was in answer to questions propounded to appellant compelling him to say something to them in return, that the confession was not voluntary but purely coercion and trapping on the part of the officers. Riley v. State, 4 Texas Crim. App., 538; Rains v. State, 33 Texas Crim. Rep., 294; Sparks v. State, 34 Texas Crim. Rep., 86; Walker v. State, 7 Texas Crim. App., 245.

Because the court erred in admitting that particular part of appellant's confession in reference to his father and mother being jealous of one another and not living together, it being misleading, irrelevant and in no way connected with this case, but had a tendency to influence the minds of the jury by the State trying to prove a motive in an irrelevant and misleading manner by injecting this uncalled-for part of the pretended confession of appellant, which did mislead and inflame the minds of the jury against appellant on the trial of this cause. Rix v. State, 33 Texas Crim. Rep., 353; Penny v. State, 42 S. W. Rep., 297.

Because the corpus delicti was never proved sufficiently to sustain the verdict of the jury and judgment of the court and that there was never any motive proved by the State to sustain the verdict of the jury and judgment of the court for murder in the first degree. Lovelady v. State, 14 Texas Crim. App., 545; Wharton on Homicide, sec. 641; Anderson

v. State, 34 Texas Crim. Rep., 546; Kugadt v. State, 44 S. W. Rep., 989; Brown v. State, 1 Texas Crim. App., 154.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was found guilty of the murder of his wife, his punishment assessed at death.

Several bills of exception were reserved to the action of the court overruling cause for challenge urged by appellant to some of the jurors. All of these jurors were challenged peremptorily. When the eleventh juror was accepted by appellant he still had one peremptory challenge left. The twelfth juror accepted, stated he had no opinion whatever as to the guilt or innocence of the accused. He was accepted by both parties. So it would seem from this statement by the trial court, when the twelfth juror was accepted, appellant still had remaining and unexhausted one peremptory challenge. No juror sat upon the jury who was in any way objectionable. Under the unbroken line of decisions construing our jury laws, a defendant cannot urge a reversal for supposed erroneous rulings of the court in not sustaining causes for challenge, unless some objectionable juror has been taken on the jury.

Owen was permitted to testify that appellant, in a conversation with him, used the following language: "My old daddy and mammy are parted now on account of him being jealous of her; says I hain't built that way." Objections urged were its irrelevancy, misleading and not a part of the res gestæ. This conversation took place on Thursday evening, deceased having been missed since Wednesday night, and while witness and appellant were searching for appellant's wife. The court qualifies this bill, "that the witness Owen had already testified to many things the defendant said to him about his (defendant's) people, etc. The defendant was not under arrest." We believe this testimony was properly admitted. Defendant by his statement had left the impression that his wife had deserted him and run away with another man. Subsequent developments showed that she had been killed on Wednesday night, by being choked, and buried in appellant's garden; and in seeking for the motive for the killing evidence was introduced to show there was no jealousy existing between them, and that they lived happily together.

Some objections were urged in the motion for new trial to the introduction of appellant's confession made to the sheriff and in the presence of the jailer. This evidence was admitted without objection at the time. No bill was reserved, and it was criticised for the first time in the motion for new trial. This comes too late. In fact, even had an objection been urged, it occurs to us that it would have been without merit, for the facts show he was fully warned before the statement was made.

When the case was called for trial, motion was made to change the venue on account of prejudice against appellant in Red River County.

The affidavit was signed by appellant, his brother and brother-in-law. The controverting affidavit was signed by the sheriff. Appellant took the stand in his own behalf in regard to this motion, as did the brother and brother-in-law. He also introduced in evidence extracts from the editorials published in a couple of newspapers. It seem that the newspaper articles were rather critical in their write up of the homicide. One of the main points urged was the fact that when the sheriff arrested appellant about the time of the discovery of the dead body, he was. carried to Lamar County and incarcerated in that jail for safe-keeping; and there were statements to the effect that this was done to prevent possible or probable mob violence. It is admitted that a mob was not formed nor sought to be formed; but the current talk was that he was carried to Lamar County for safe keeping for fear of being mobbed. The sheriff testified that appellant was carried to Lamar County for sake keeping—not that he anticipated any mob violence, but because of the insecurity of his jail. He testified that the jail of Red River County was anything but a safe one in which to place prisoners. The examination took rather a wide range, and to meet defendant's case made by his witnesses—that there was a great deal of excitement at the time, and the articles referred to as having been published in the papers intensified that feeling, the State introduced a list of witnesses who had lived in the county from about five to sixty years, from practically all sections of the county, who testified that there was no such feeling of prejudice in the county as would debar appellant a fair and impartial trial. They practically agree that at the time of the killing, or just after its commission and discovery, there was more or less talk in the country predicated very largely upon the newspaper statements; it was shown that appellant was almost an entire stranger in the county, lived in the extreme eastern edge of it, and was not known out of that immediate neighborhood. Some of the county officers and ex-officers were placed upon the stand and testified they had never heard of him at the time this killing occurred, although they had canvassed the county electioneering among the people. It is practically made to appear that all the talk and conversation, or nearly all of it, in regard to the homicide occurred immediately after it occurred and rather incidental to the statement in the papers. Whatever feeling had been engendered at that time had practically passed away, and it had not been discussed more than any other murder case would have been discussed for a considerable period of time: in fact from shortly after the arrest of appellant, these witnesses practically all agree there was no prejudice in the county against appellant such as would prevent a fair and impartial trial; that there were anywhere from 5,300 to 6,000 qualified jurors in the county, and whatever of prejudice may have or was then existing against accused, was confined mostly to the immediate section where the homicide was committed, to wit: the eastern end of the county. Without going further into the statement of the evidence, and its details, which was very full and covered every section of the county, we do not believe the evidence.

was of such a character as required a charge of venue. The evidence is not as strong showing or tending to show the prejudice in this case as in many others that have come before this court, in which the action of the trial court was sustained in refusing to change the venue. The cases relied upon by appellant, to wit: Gallaher v. State, 40 Texas Crim. Rep., 296; Randle v. State, 34 Texas Crim. Rep., 43; and Moore v. State, 79 S. W. Rep., 565 are not in point. That is, the case here made by the facts is not brought within the rule laid down in those cases.

It is contended that the evidence is not sufficient to justify the verdict. To this contention we cannot agree. The evidence discloses that appellant and his wife were living together alone at the time of the killing; that their marital relations were as pleasant as ordinarily between husband and wife; they were seen the day before the homicide at night between dinner and sundown working together on a fence. This was on Wednesday evening, and she was never seen afterwards alive. Her body was found on Friday, buried in the garden, between two rows of onions. Her body was arrayed in her night gown and wrapped in a quilt, and showed that she had been choked. There was a large knot on her forehead, also one behind the ear, and her skull was crushed in the back part. One or two of the witnesses testified to the fact that her neck was broken. After the homicide, which occurred sometime during the night after their retirement, appellant had buried the body, and then gotten his horse, hitched it to the plow, and plowed out the onion-patch, seeking to obliterate all signs and evidence of her burial place. The rows of onions were about three feet apart, and the digging of the grave was done with such expertness that the onions in the rows upon either side, except one onion, was not broken or in any manner disfigured. He returned his horse to the barn, after finishing the plowing, placed his wife's saddle upon her pony, and turned him on the outside of the enclosure. This horse was seen some distance away the following morning returning in the direction of appellant's home with his wife's saddle on him. Appellant was with the hunting party, and suggested one or more theories as to her absence; among others, that he believed she had run away or eloped with another man. All of that immediate section of country was investigated and water-holes examined for the missing woman, until Friday, when her body was found buried in the garden. His confession was also introduced to the effect that on the night of the homicide he and his wife had agreed to go fishing in the little creek near the house where they lived; that his wife finally declined going on account of being tired. She retired, and he states he went to the creek and fished a little while; returned to the house and went to bed in the same bed with his wife; that he was drinking some, and when he awoke during the night he was choking his wife and continued to choke her until she was dead; that he then buried her in the garden and plowed out the onion patch in which she was buried. No reason or motive is assigned by him. Nor does the testimony anywhere show a motive. The singular phase of the case, perhaps, is found in the fact that there

is no motive developed; but the manner of the killing and the attendant circumstances justify the jury in assessing the highest punishment. There is one other fact that may be stated here, perhaps; that is, that there was a mallet found in the room which showed that it had been either scraped with a knife or "sandpapered" to obliterate evidence of blood. Outside of two or three little spots of blood on one of the pillows and on the mallet there was none found in the room where the killing occurred. Appellant and his wife were about the same weight: she weighed 130 to 140 pounds, and he about 140 or 145 pounds. The evidence is sufficient. The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### December 17, 1904.

DAVIDSON, PRESIDING JUDGE.—On a former day of this term, the judgment herein was affirmed. Appellant has filed a motion for rehearing on the ground that this court erred in holding that the trial court did not err in overruling his motion to change the venue. We have reviewed the evidence again, and do not believe that error was committed in affirming the judgment. The opinion is criticised on account of this statement: "It is admitted that a mob was not formed, nor sought to be formed; but the current talk was that he was carried to Lamar County for safe keeping, for fear of being mobbed." The expression that "it is admitted that a mob was not formed nor sought to be formed" is more a conclusion from the facts than as a real statement from any of the witnesses. A reference to the bill of exceptions containing the evidence introduced in regard to the change of venue, fully sustains that statement in the opinion. One of the witnesses states, "They told me they were afraid of a mob and removed him for safe keeping." The same witness, in answer to the question, if he had heard of any organized mob or anything of the kind against appellant since the offense was committed, answered, "I have heard of them talking of making it up." "Q. Have you heard of any being organized to do that? A. Nothing, only I heard them talking about making it up." This witness was the brother of appellant. Witness Latimer states, "If there was any mob I do not know anything about it. I do not know anything in regard to a mob at all. I do not know of any organization or combination of citizens in this country, or mob, to do any kind of foul play to this defendant, I never heard of any at all." Again, he says, "I never heard of any mob." Q. "Did you ever hear of anybody saying anything about organizing a mob at all? A. No, sir; I never did." Mahaffey testified, that he never heard of any rumor of a mob. He further states, "I heard of this man being removed to Paris for safe keeping to prevent a mob. No, sir, I never heard of any mob." The court asked the question, "Do you know of a single solitary man that ever said anything to you about a mob? A. No, sir; I never knew anything at all, except just what I saw in the newspaper about what it said about a mob.

I never heard of any mob being organized anywhere in the county. I never heard of any men getting ready to organize a mob." Witness Coleman was asked: "You do not know of any combination existing anywhere in the county? Did you ever hear of any organization of any mob of men getting together to form a mob, or anything of the kind? A. I never heard of it in any part of the country." Whiteman says, "I never heard of any combination existing among any people or any class of people to mob defendant or to do him any harm." Witness Wright says, "I do not know that there was a mob formed. I do not know that any man ever attempted to form a mob." These are some of the statements of the witnesses. We believe these statements justify the statement of the court in the original opinion. No witness testified that there was any mob formed or that anybody sought to organize a mob. There was some talk in the county that defendant was carried to Lamar County, and placed in jail in Paris, to prevent his being mobbed. Whether correct in the statement criticised the facts are as above stated.

That portion of the opinion is also criticised which refers to the testimony of the sheriff. The motion for rehearing contains this language: "The court is in error as to the testimony of the sheriff of Red River County. The record fails to show that the sheriff testified at all; in fact he did not testify on the hearing of the motion to change the venue." Bill number 10 contains the evidence developed on the motion to change the venue, and is found in the record from pages 73 to 97. The sheriff's name was S. T. Dinwiddie, and was one of the parties who filed affidavit contesting appellant's motion to change the venue. He testified before the jury in regard to the facts of the case, and his testimony is found on pages 36 and 37 of the transcript in the statement of facts developed on the trial of defendant before the jury. He also testified on the motion to change the venue. His testimony is found on pages 92 and 93 and in bill of exception No. 10. If this record is a true one, and the statement of facts is signed by the district attorney and one of appellant's attorneys, and approved by the trial judge; and the bill of exceptions which contains the testimony introduced on the motion to change the venue, is signed by the same attorney, B. P. Lewis, Esq., and approved by the district judge, Hon. Ben. H. Denton. So, we think, the opinion is fully sustained by the fact that Sheriff Dinwiddie did testify on the motion to change the venue. If the opinion is wrong in stating that fact, then appellant's bill of exception is not correct, for it contains the sheriff's testimony introduced on the trial of said motion. The motion for rehearing is overruled.

*Overruled.*