## T. R. WATSON v. THE STATE.

### No. 4450. Decided June 19, 1918.

**1.—Murder—Venue—Jurisdiction—County Where Death Occurs.**

The statute provides that venue may be in either the county where the shooting occurs or where the party dies, and where the shooting occurred in. one county and the injured party was carried to another county, in which he died of the effects of the shooting, the venue was properly laid in the. county where he died.

**2.—Same—Continuance—Waiver—Agreement—Depositions.**

Where the alleged absent witnesses were present at the trial, with the exception of one, with reference to whose testimony the State agreed, on. account of the physical condition of the witness which made him unable to attend, to waive all formalities and let his deposition be taken, which was declined by the defendant, and who seems to have abandoned any question as. to this witness, the application was correctly overruled.

**3.—Same—Change of Venue—Discretion of Court—Bill of Exceptions.**

Where the motion for a change of venue was overruled and the evidence was conflicting, and there was no showing of an abuse of discretion on the part of the court, there was no reversible error. Following Tubb v. State, 55 Texas Crim. Rep., 606, and other cases. Besides, it is a very serious question as to whether the bill of exceptions was filed in proper time; however,. the same is considered on its merits.

**4.—Same—Evidence—Books — Papers — State Bank — Bank Examiner—. Opinion of Witness—Motive.**

Where, upon trial of murder, it appeared that the homicide grew out of the fact that deceased, who was the Commissioner of Banking and Insurance,. in attempting to close defendant's State bank on the ground of insolvency was shot by defendant, and from all the evidence, both for the State and the defendant, it was already shown that defendant recognized the insolvency of his bank, etc., there was no error in permitting a bank examiner to testify that he examined the books and papers of said bank and that he considered the same in an insolvent condition; besides, similar testimony, together with. forged papers by the defendant to cover his insolvency, and all details with reference to the papers examined by said examiner was already admitted in evidence, most of it without objection by the defendant, which tended to show malice and motive on the part of the defendant in killing the deceased, there was no reversible error.

**5.—Same—Evidence—Contradicting Witness.**

Where the testimony of the State's witness was attacked in various ways, by laying a predicate to contradict her testimony, there was no error in permitting the State to show that the witness had made certain prior statements corroborative of her testimony on the trial.

**6.—Same—Evidence—General Reputation—Practice in District Court.**

Where defendant offered evidence of his previous good character, both for honesty and truthfulness, and had introduced several witnesses along this line, there was no error, in order to shorten the trial, to permit the State to admit such reputation as claimed by the defendant through his witnesses and thus close the matter.

**7.—Same—General Reputation—Impeaching Witness—Rule Stated.**

The rule is that a party who sustains the reputation of the witness is entitled to show by testimony that from such reputation the witness is worthy of credit and belief, and where defendant declined to admit this, but would

only admit his good reputation there was no error in permitting testimony that the State's witness was worthy of credit and belief. Following Clements v. State, 193 S. W. Rep., 1066.

### 8.—Same—Evidence—Photograph.

Where the homicide occurred in and about the State bank of which the defendant was president, there was no reversible error in introducing in evidence photographs of the interior of the bank, including the desk occupied by defendant as president.

### 9.—Same—Evidence—Circumstantial Evidence.

Where the homicide grew out of the fact that the deceased and his companion as State officers were examining at the time the solvency of the defendant's bank and had in their possession certain papers with reference thereto, which were left in the grip of the examiner in the bank when the shooting occurred, there was no error in admitting testimony that he recovered this grip a few hours later and that it had been rifled of its contents. .

### 10.—Same—Evidence—Res Gestae—Dying Declarations.

Upon trial of murder, there was no error in admitting in evidence the statements of the deceased immediately after being shot and also the statements he made later to his physicians. These were both res gestae and dying declarations.

### 11.—Same—Evidence—Other Offenses—Suspended Sentence.

Where, upon trial of murder, defendant filed his plea for suspended sentence, there was no error on cross-examination of defendant to require him to answer that he had been indicted in several cases for forgery since the homicide; besides, all these matters were introduced by other testimony without objection.

### 12.—Same—Evidence—Opinion of Witness.

On trial of murder, there was no error in excluding testimony as to a statement of witness that in his opinion defendant believed that the deceased was armed at the time of the shooting.

### 13.—Same—Argument of Counsel—Acts and Declarations of Third Parties.

Upon trial of murder, there was no reversible error in the acts and declarations of°the wife of the deceased during the argument of defendant's counsel, who turned towards her and ·said that he had the deepest sympathy for her, etc., to which she replied, "Yes. You claim to be the friend of my husband and followed him to the grave."

### 14.—Same—Evidence—Clothes of Deceased.

Where, upon trial of murder, there was a sharp contention about some of the matters incident to the shooting as to the location of the parties and the wounds inflicted, there was no error in introducing the coat of the deceased in evidence, which he wore at the time he was shot

### 15.—Same—Charge of Court—Weight of Evidence.

Where, upon trial of murder, it was not an issue that the deceased, at ·the time he was shot was the Commissioner of Banking and Insurance of the State of Texas and was clothed with the power to close a State bank, there · was no error in the court's charge that as such commissioner he had the right ·under the law of the State to close the bank in question at the time he was shot by the defendant, and this was not a charge on the weight of the evidence.

### 16.—Same—Charge of Court—Self-defense.

Where, upon trial of murder, the court gave a proper charge as applicable to the facts in the case, on the law of self-defense, there was no reversible

error; besides, it was more than questionable that the issue of self-defense was raised by the evidence.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*Pat M. Neff, R. M. Edwards, J. Ross Bell, L. T. Dashiell,* and *Jed C. Adams,* for appellant.—On question of change of venue: Randle v. State, 34 Texas Crim. Rep., 43; Meyers v. State, 39 id., 500; Gallagher v. State, 40 id., 296; Faulkner v. State, 43 id., 311; Cortez v. State, 44 id., 169; Dobbs v. State, 51 id., 629; Coffman v. State, 62 id., 88; Streight v. State, 62 id., 453; Barnes v. State, 59 S. W. Rep., 882; Sorrell v. State, 74 Texas Crim. Rep., 505, 169 S. W. Rep., 299

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of murder and allotted a long term of years in the penitentiary.

The party alleged to be killed was John S. Patterson. The facts show that Mr. Patterson was Commissioner of Banking and Insurance of the State of Texas, and as such had charge of enforcing the law with reference to banking in the State. Appellant and his two sons, J. E. and W. R. Watson, were bankers in Freestone County, in the town of Teague, and had been for several years. The bank had been in serious trouble from a financial standpoint and its management prior to the time Patterson became Commissioner of Banking and Insurance. Appellant and his two sons, who were respectively president, vice president and cashier, controlled and managed the bank and its affairs. There seems from the testimony to have been but little, if any, conference between these three parties and the board of directors of the bank. The bank had been in trouble with Mr. Collier, Mr. Patterson's predecessor.

The record is very volumious on legal questions as well as evidence, covering 1600 or 1700 pages of typewritten matter. This includes the original bill of exceptions with reference to change of venue. There is a great deal of testimony in the record showing the trouble between the Banking Commissioner and appellant and his sons with reference to their management of the bank and its affairs. This run through several years. Several bank examiners had gone over the affairs of the bank and found it practically in an insolvent condition as far back as 1914, if not in 1913. These bank examiners had talked at various times with appellant about the condition of the bank and sought in various ways to assist the officers in keeping the bank in a solvent condition. The bank seems to have been run in violation of the banking laws of the State in sundry ways. These matters are all set out in the record and

unnecessary to be repeated. Appellant was notified of these conditions by these examiners, and by, it seems, Mr. Collier as well as Mr. Patterson, and was warned that the bank must rectify its affairs or be closed. Promises were made by appellant to conform to the law but were not carried out. Finally, in 1916, conferences were held between one or more of the bank examiners and appellant and one or both of his sons, in regard to the condition of the bank and its failure to comply with the law in many respects, and promises were made by appellant that these matters would be rectified and the bank put upon a proper basis. The insolvent condition was fully and freely discussed; also that its reserve was far below that required by the law, and that appellant and sons as officers of the bank had borrowed for themselves from the bank far beyond what the law authorized, and this without an order or the consent of the directors. Many of these matters are evidenced in writing and correspondence with appellant. Some of these warnings given appellant as president were in writing and some in conversations. About May or June, 1916, the affairs of the bank were again examined by the bank examiner and found to be insolvent, and the bank examiner had a conversation with appellant at Hillsboro, not wishing to go to Teague, where the bank was, in order to avoid calling attention to its condition and thereby injuring the bank. Their purpose was as stated to assist appellant in putting the bank "on its feet." The policy of the Commissioner of Banking and Insurance was not to wreck but to sustain all banks of the State, and to this end he rendered all the assistance possible to avoid closing it. In May or June the reserve was far below what the law demanded, and in August, at the time of the killing, instead of having the bank reserve which was supposed to be in excess of fifteen thousand dollars, it only had on hand in its cash reserve less than two thousand dollars. When this condition was ascertained from the report of the bank examiner Mr. Patterson, with Mr. McKinnon, one of the bank examiners, went to Teague and went over the bank books and found the bank hopelessly insolvent and burdened with forged paper to approximately sixty thousand dollars. All previous efforts to assist the bank had been disregarded, and the promises of appellant and his sons were not fulfilled, nor was there sought to be any compliance with the demands of the Commissioner under the agreement on the part of appellant. There was also a great deal of forged paper in the bank carried as assets. These forgeries amounted, it seems, to sixty thousand dollars, equalling the capital stock in amount. A number of these forged papers and perhaps other papers were in possession of McKinnon and Mr. Patterson at the time of the homicide. Some of them were in the grip of McKinnon, and it seems some of them in the grip carried by Mr. Patterson. On the evening of the homicide the bank matters were gone over by Patterson and McKinnon in the bank. The closing hour of the day arrived and the bank was closed for business. Appellant left the bank and went to his residence, a few blocks away. J. E. and W. R. Watson, sons of appellant, and officials of the bank,

remained. The bank matters were gone over and discussed, and the cash reserve counted and found to be less than two thousand dollars. This money was placed in the safe, locked and the time combination turned. One of the sons alone had the combination and knew how to open the safe. Among other items of cash was $890 in currency. This was placed in the safe. A day or two afterwards when the officers took charge of the bank and placed it in the hands of a receiver this $890 had disappeared from the safe. No one, it seems, had been in the bank from the time it was closed on the evening of the homicide, so as to get in the safe, unless it was appellant or his son. This became the subject of evidence and an issue on the trial. After appellant left the bank at the closing hour in the evening, and after a conversation between the parties with reference to other matters mentioned, appellant was requested by one of his sons over the phone to come to the bank, stating that there was trouble. Appellant shows when he received this message, not knowing what trouble was meant, got his pistol and carried it with him to the bank. Upon entering the bank his two sons and McKinnon and Patterson were its occupants. A conversation occurred in which the different parties engaged and appellant was notified that the bank would be closed permanently, and Mr. Patterson ordered Mr. McKinnon to place a notice on the window to the effect that the bank was so closed. Appellant's testimony is to the effect that he asked Patterson to defer this three days; that he could perhaps make arrangements to put in it the proper reserve and carry on the bank business. This was not agreed to by Patterson, and the evidence tends to show that he told him that he had been trying to assist them carry on the bank in its insolvent condition and assist him under promises that appellant would rectify things, that he had not done so, and it would be closed. At this juncture Patterson started out of the bank. The evidence is conflicting as to just the position of the parties at this time. The evidence shows that as Patterson passed out of the door appellant shot him, then turned and fired at McKinnon. McKinnon testifies after appellant fired one shot at him that one of appellant's sons, J. E. Watson, grabbed or took the pistol from his father and fired at him two or three times as he ran out the back way. Patterson had his leather case or grip in his hand with papers in it at the time he was shot. McKinnon's grip with other papers in it was left in the bank in his flight. After Patterson left the door of the bank was immediately closed and the three Watsons remained in there from fifteen to thirty minutes. When McKinnon recovered his grip that night it had been broken open and some of the papers had disappeared. Appellant, after these transactions, left the bank, going the back way and went a different street towards his home from that he usually traveled. He was seen by a boy to throw torn papers in the weeds along the trail he was following en route to his house. These were torn up notes or checks that had been in the possession of McKinnon and taken from his grip. The boy thinking they

were candidate cards appellant had thrown in the weeds went·to get them as he said to prepare them as a deck of "flinch cards." Upon reaching the scene he found they were not candidate cards but were torn up papers. Appellant says these papers were torn by his sons and handed to him, and in going home he threw them away at the place designated. The testimony of the boy indicates that appellant tore them himself and threw them away. It is not considered material whether they were torn in the bank or after he left it. Upon the arrival of the stepfather of the boy at home that night the boy informed him of what he had seen, and he instructed the boy to get the papers, which he did the next morning. They fell into the hands finally of the receiver of the bank. These were some of the papers that carried evidence of forgery. Appellant claimed in his testimony that he was not aware of the fact that these notes were forgeries. To go into detail would make the statement too lengthy, and it is dismissed with the statement that he was evidently aware of the fact of the insolvent condition of the bank and had been two or three years, and that these forged papers were used as assets of the bank. Some of them he had copied and kept in the bank among the papers .of the bank as assets while the original forged notes were used as the basis of borrowing money. The shooting occurred in Freestone County. Patterson was carried, after being shot, from Teague, in Freestone County, to Waco, in McLennan County, and placed in a hospital. He died in Waco in a short time.

One of appellant's contentions is that the jurisdiction or venue of the case was legally in Freestone and not in McLennan County, and he filed his plea setting up that question. The statute provides that venue may be in either county where the shooting occurs, or where the party dies.

Appellant filed an application for continuance which was overruled. There were four witnesses mentioned, among those, the father of appellant, a very old man, past ninety years of age. Another was called in the record Taz Watson. Two of the witnesses were present. Appellant's father did not attend, it seems, and the record indicates that he abandoned any question as to that witness. Taz Watson was present and testified contrary to what appellant alleged in his application for continuance he could prove. The negro Green did not attend and was physically unable to attend. It seems to be an uncontroverted fact that Green was in the last stages of consumption and could not attend court. The trial lasted about six weeks. To secure the testimony of this witness, the State proposed, under the showing made of the physical incapacity of the witness, that defendant could take his depositions, and would render every aid possible in securing his testimony and waive all formalities and let his depositions be taken. This was declined. We are of opinion that under the showing here made there is no error in this matter.

Appellant filed a motion to change the venue. This was overruled.

The evidence is voluminous, covering several hundred pages. The court, approving the bill, qualified it at some length. The court certifies that the evidence was conflicting, and in his judgment there was no sufficient reason shown why appellant could not obtain a fair trial in McLennan County. Among other things, the court says that "there was no evidence whatever of any activity in connection with any alleged conspiracy, nor was there evidence of any dangerous combination. There was no evidence of any excitement or unusual interest in this case during the trial thereof, either on the hearing of the application for a change of venue or the trial of the case, which consumed something over a month. During the entire time that the court was hearing the application for change of venue there were very few persons in and around the courtroom, except those were there under process of the court. This condition prevailed throughout the entire time of the trial, with the exception that as the trial began to draw to a close, the number of spectators grew larger, as the public did not know exactly when the trial would close and the speech-making would begin. There were several orators of note, including Jed Adams and Cullen Thomas of Dallas, and Trav Dashiel of Leon County, and also the local counsel. The argument of the case attracted quite a crowd, but this and a day or two prior to the beginning of the argument were the only times that there was any unusual crowd in the courthouse. The interest in the argument, as distinguished from the interest in the case, was what attracted this crowd. Otherwise, the attendance of spectators in the trial showed conclusively that there was no unusual condition in the sentiment of the county, with reference to the case."

The court also qualifies the bill with reference to the conditions of the case surrounding the empaneling of the jury. The qualification covers quite a number of pages. Further qualifying the bill the court says: "The court understands the law to be that an application for a change of venue is addressed to the sound discretion of the court, who is upon the ground and is supposed to be conversant with the conditions in his county, and that his action thereon should be determined by his deepest sense of duty, and with the full approval of his conscience. The court acted upon this rule in overruling this application for a change of venue, and after patiently giving the defendant over a week to introduce testimony in support of his motion, there was not left remaining the slightest doubt in the mind of the court that an absolutely fair and impartial trial alike to both the State and defendant could be had in McLennan County. The court was and is well acquainted with nearly all, if not all, the witnesses for the defendant, and conversant with their opportunities of knowing the condition of public sentiment in McLennan County, as well as with their interests in the case. It appeared that out of the great number of witnesses summoned by the defendant on the motion, that a very large per cent of those used were former residents of Freestone County and acquaintances of the defendant, who were biased in his favor; and opinion evidence on the

application to change the venue of a case being of such a character as is very largely controlled by the will rather than the judgment of the witness; the court for this and other reasons did not attach great importance to the opinion of those particular witnesses. As to the other witnesses, some of them were men whose chief avocation was hanging around hotels and other public places and engaging every one they could in conversation upon current events, and still others with eccentric opinions, in whose judgment no one who knew them could attach any great importance. Aside from this, the court knew, as a matter of fact and from having seen the general State newspapers and from a knowledge of such things in general, that there was practically as much information gained by all of the reading public in Texas as there was by the reading portion of the citizenship of McLennan County, and that if a mere one-sided newspaper report of a current event was to disqualify the citizenship of this county from jury service and require a change of venue, then the same conditions practically would be found in every county in Texas. The court, under these conditions, deemed that the best ends of justice and right would unquestionably be met by a trial of this case in this county, and by the court exercising the greatest care to see that no improper juror or sentiment found his way or its way into the jury box, and that the court should be extremely liberal in standing aside jurors for cause; and acting upon this theory a great percentage of the jurors whom the court permitted to be stood aside for cause were in fact legally qualified and competent jurors under the laws of this State. . . . The matter of the change of venue of this case, as this court viewed it, remained in the discretion of the court throughout the empaneling of the jury. The court was, as above stated, after the examination of all of the witnesses, of a clear and confident opinion that a fair and impartial jury could be empaneled. The examination of the jury confirmed this opinion of the court, and had it not done so, he could and would have granted such relief as was necessary to insure a fair trial. Whatever conclusions or opinions might have been drawn from the evidence as to whether or not a fair jury could be empaneled in this county, it is demonstrated beyond per adventure or doubt that if confidence is to be reposed in the honesty of men, a fair and impartial jury was, in fact, secured in this case and that without any great trouble." Then follows a statement of the examination of the jurors who were selected and sat in the case. The above are but brief extracts from the qualification of the judge.

This bill was accepted by appellant as qualified and it is thus before this court. As this bill is presented we are of opinion that the discretion of the judge is not shown to be sufficiently erroneous, if erroneous at all, as to require a reversal. In Tubb v. State, 55 Texas Crim. Rep., 606. Judge Ramsey used this language: "Of necessity in respect to a question of this kind much ought to be left to the discretion and sound judgment of the court trying the case, and in no case should the judgment of conviction be set aside on account of the action of the

WATSON v. THE STATE. · 123

trial court in refusing a change of venue unless it is clear that such court has abused his discretion. This is the doctrine laid down in almost the precise terms above stated by Judge Hurt in the case of Gaines v. State, 38 Texas Crim. Rep., 202, 37 S. W. Rep., 331. See also Cox v. State, 8 Texas Crim. App., 254; Bohannon v. State, 14 Texas Crim. App., 271; Martin v. State, 21 Texas Crim. App., 1; Connell v. State, 75 S. W. Rep., 512; Reeves v. State, 83 S. W. Rep., 803; Earles v. State, 85 S. W. Rep., 1; Adams v. State, 93 S. W. Rep., 116. After a careful inspection of the record, we do not believe that we could or would be justified, in view of the action of the trial court in conflicting evidence, in reversing the judgment on the failure of the court to grant a change of venue." This case was followed in Mooney v. State, 76 Texas Crim. Rep., 539, and in Barnett v. State, same volume, page 555. The writer of this opinion did not agree with the decision in the Barnett case, supra. The disagreement was not on the law but on the facts and their application to the law. But under the authorities, as this record is presented, we are of opinion that the court did not err in refusing to change the venue. The matter is treated as if the bill of exceptions was filed in proper time. It is a very serious question as to whether or not the bill was so filed. The transcript shows that the bill of exceptions was properly drawn and presented to and approved by the court on the last day of the term, but it shows that it was not filed until the 23rd of March after the adjournment of court in the previous December. The original bill of exceptions was ordered sent up by the trial judge. On the back of this bill of exceptions it shows to have been filed in term time. This original bill is not verified so that it can be considered, strictly and technically speaking. The clerk does not identify it as the original bill ordered sent up, but we treat those matters as rather technical and disregard them and pass on the merits of the bill.

Another bill recites that while McKinnon was testifying in behalf of the State he testified he examined the books and papers of the Farmers & Merchants State Bank of Teague, Texas, in May, 1916. That is the bank in question. He was then asked what he found. Various objections were urged to this question. He answered, "At that time I found the bank in what I considered an insolvent condition." Objection was again urged. The State then asked: "You say that on that occasion you considered the bank insolvent, in your opinion?" Objection was urged, and he answered, "Yes, in my opinion, I found enough of the assets of the bank that I considered to be what we call bad, not collectible, doubtful." Further answer was not given. It seems to have been cut off by objection. The central point of objection seems to have been that this was but a conclusion or opinion of the witness, and that the bank papers and books would have been the best evidence. There is quite a lengthy qualification to this bill. The court says the witness was an officer of the State Department of Banking and Insurance, being what is known as a bank examiner under

the deceased, John S. Patterson, who was Commissioner of Banking and Insurance at the time. The qualification further states that the finding of that department, which was authorized to be made by a bank examiner, or upon his report as to the condition of the bank, with reference to solvency, was sufficient under the law to justify the closing of the bank by that department, if such officer found said bank to be insolvent. That its solvency or insolvency is not a question of opinion, but is a question of fact, and defendant could have and did cross-examine said witness fully as to all the facts upon which he based his statement that the bank was insolvent, and brought before the jury all the facts bearing upon the correctness of the statement of the witness as to the insolvency of said bank. "It was, of course, impossible for the jury to have understood the books of the bank and all of the details with reference to the papers, or to have had all the records and paper introduced, and even that would have left the question as to the solvency of the makers of various notes and the character of the paper.

"In this case, as the court understood it, one of the issues was as to the right of the Commissioner of Banking and Insurance, under the law, to close this bank, and of the conclusions reached by that department as to the solvency of the bank and as to the good faith of the Commissioner in closing the bank, which good faith had been and was being questioned by the defendant; and in addition to all of this, the defendant's own testimony and the uncontradicted testimony of a great number of witnesses showed conclusively and without dispute, and it was an admitted fact in the case, that said bank was in fact insolvent in May, 1916, and for a long time prior thereto and continuously thereafter until it was closed by the Commissioner, at which time he was killed, and it, therefore, occurs to the court that even if there was technical objection to this testimony, that it could not be harmful and hurtful to the defendant." This is the qualification placed on the bill by the court.

There are a number of bills of exception reserved to the testimony of McKinnon with reference to his examination of and statements concerning the bank. They are all largely to the same effect and go to the same line of examination. This record discloses, we think, without question that the bank was insolvent. All of these matters were gone into thoroughly and fully, much of it without objection. Some of it was introduced by the State and some by the defendant, covering the history of the bank and its condition since 1913 up to the time of the closing of the bank and killing of Patterson. These matters were gone over with appellant himself both in person and by correspondence, all of which is shown in the record. All of these matters from every viewpoint show that appellant recognized the insolvent condition of the bank and all the matters practically connected with it that were brought under discussion in these conversations by the commissioners and others with defendant and his sons, as well as the correspondence that passed between appellant, as president of the bank, and Mr. Collier, Patter-

son's predecessor, and Patterson himself, as well as correspondence be-
tween bank examiners and appellant with reference to matters of the
bank and their investigation. In one of these letters or communica-
tions from the banking department to appellant he was notified of the
condition of his bank again, and his attention was called to the fact
that he was violating quite a number of the statutes with reference to
the business management of his bank, and was informed that some of
these had rendered him liable to prosecution for felonies and incar-
ceration in the penitentiary. We are of opinion that this record is
full of testimony, some of it unquestioned and to which no objection
was urged, showing the complete insolvency of the bank and the efforts
of the banking commissioners and examiners to assist appellant in
putting the bank on its feet and in running operation again instead
of wrecking it. It is shown beyond question that the bank had a great
number of forged papers, notes used in connection with its banking
business, as assets. There came an issue also in this connection be-
tween appellant's testimony and that for the State as to appellant's
knowledge of these matters. He stated that while he was president
of the bank he was only nominally so, and had little to do with its
affairs, and was really a figure-head in the concern. A great deal of
this testimony and correspondence was introduced to meet that phase
of appellant's testimony. The State's contention was that he was not
only the president but was actively so engaged in the business and
management of it and in borrowing and seeking to borrow money from
different sources to carry on the business of the bank, and that he did
in fact borrow money; that he transcribed a number of the forged notes,
or made duplicates, the duplicates being kept in the bank as assets and
the originals were hypothecated as collateral for borrowing money.
There is also evidence from him personally, and in writing to the effect
that there were papers in the bank he knew to be forgeries; that he
wrote one party that he had used his name and hoped and thought that
it would be all right with him. This record is so voluminous with this
character of testimony that it would be practically out of the question
to try to state details. The transcript contains 600 pages of evidence.
What has been said will cover a large number of bills of exception
which are voluminous, and most all of them, if not all, were fully
qualified by the trial judge, showing his reasons for letting in the tes-
timony. We are of opinion that none of the bills show error. All
such evidence was admissible also to show malice and motive. The
bank was wrecked on account of these facts and occurrences which
caused him to close its business. The closing of the bank brought
about the killing by appellant. Branch's Ann. P. C., p. 1042, for cases;
Wharton Crim. Ev., pp. 165, 165v, 1649.

There is another bill reserved to the ruling of the court permitting
the State to show that the witness Miss Manahan made certain state-
ments corroborative of her testimony on the trial. Her testimony was
attacked in various ways by laying a predicate to contradict her and to

show a denial on her part of any knowledge of the killing. In other words, in several ways her testimony was attacked by appellant. In view of this condition the State was authorized to sustain her in the manner shown by the bill of exceptions as well as by the introduction of evidence of her good reputation as a lady of truth and veracity as was done.

Another bill recites that appellant offered evidence of his previous good character both for honesty and truthfulness. After several witnesses had been introduced along this line the State admitted that his reputation was such as claimed by him through his witnesses. This admission was made largely, as shown by the bill, to shorten the trial and save time in examining a great number of witnesses. Under the decisions of this State this was proper practice.

Another bill shows that McKinnon's character as a truthful man was called in question by the defendant, especially with reference to laying a predicate for impeachment and contradicting him. The State, to meet this, introduced some witnesses to show the fact that McKinnon was a man of good reputation for truth and veracity. Appellant admitted finally that his reputation and standing in the respects inquired about was good, but refused to admit that it was such as would justify the jury in believing him on oath. The court qualifies this bill by stating the facts as above stated, and that he permitted the introduction of testimony as to the fact that from that reputation he was worthy of belief. So the exception really was levelled at that part of the testimony, and not at that with reference to the admission of his truthfulness and high standing in that regard. We are of opinion there is no merit in this matter. Under the decisions it seems that a party who sustains the reputation of the witness is entitled to show by testimony that from such reputation he is worthy of credit and belief. Appellant declined to admit witness was worthy of credit, but only would admit his good reputation. There was no error in this ruling. This was decided as late as Clemens v. State, 81 Texas Crim. Rep., 112, 193 S. W. Rep., 1066.

There were photographs of the interior of the bank presented to the jury showing the location of certain parts of it, especially with reference to the desk occupied in the bank by appellant as president. We are of opinion this is not a very material matter one way or the other. It tended to explain the position or particular locality of the president's office in the bank and as that occupied by appellant as his business division in the building.

Another bill shows when McKinnon ran out of the bank, while the parties were shooting at him, he left his grip with a lot of papers in it. That he recovered this grip a few hours later the same evening, it being brought to him by the sheriff. That it had been rifled of its contents. There were some objections as to the manner of identifying this and what papers were taken, etc. We are of opinion there is nothing worthy of consideration in reference to this matter.

There was an exception reserved to statements made by Patterson immediately after being shot, and also later, made to two physicians who were called to attend him. Most of this, if not all of it, was res gestae, and that made to the physicians was dying declarations. These matters were properly admitted.

While on the witness stand appellant, testifying in his own behalf, was required on cross-examination to answer the State's inquiry and state that he had been indicted in nineteen cases charging him with forgery in Freestone County, and that the indictments had been returned since the shooting of John S. Patterson, and had been returned by a grand jury of Freestone County since this case was called for trial in the District Court of McLennan County. It was claimed this was prejudicial to his rights. The court admitted this as explained by him because the defendant had filed an application for suspended sentence. We are of opinion that this was admissible under the circumstances with reference to this matter, and that all these matters had been shown before the jury any way, except the mere fact of presenting indictments, and his connection with the forgeries and other matters running through three or four years in the conduct of the bank. This testimony could, it occurs to us, be considered by the jury with reference to his plea for suspended sentence. The jury, however, failed to regard the suspended sentence plea favorably, and convicted him of murder and assessed his punishment at ninety-nine years in the penitentiary. Bearing upon his plea for suspended sentence we think this testimony was not erroneous.

While on the witness stand McKinnon was asked if he did not state to Mrs. Waller Baker, or in her presence, that neither he nor deceased, Patterson, was armed at the time of the shooting of Patterson, but that the defendant, in his opinion, believed Mr. Patterson was armed. This was offered by the appellant, and the State urged exception, which was sustained by the court. This we think shows no error. It was but the expression of an opinion on his part that he, defendant, believed Mr. Patterson was armed. It was not of a material character, and under the circumstances we are of opinion it was not admissible, and in any event was but a conclusion or opinion of the witness without any fact upon which to predicate it.

Another bill recites that while Pat Neff, leading counsel for appellant, was closing his argument for the defendant, and just before he had finished, Mrs. John S. Patterson, widow of deceased, who had testified as a witness in the case, but who had been excused from the rule by counsel for both sides and the court, had kept her place during the entire hearing of this case within a few feet of the jury and in plain view of them, she being during all the time dressed in deep mourning, arose from her seat and in the presence and hearing of the jury said to Pat Neff: "Yes, you claimed to be the friend of my husband and followed him to the grave." This bill is qualified by the judge as follows: "In the opinion of the court Mr. Neff provoked Mrs. Patterson to make the remark complained of. While he as one of defendant's

counsel was addressing the jury he turned toward Mrs. Patterson, and among other things said, in substance: 'For the little woman in black sitting over there, I have nothing but the deepest sympathy.' " As explained there is nothing in this requiring a reversal.

There is also a bill of exceptions in regard to the introduction of the coat supposed to have been worn by deceased at the time he was shot. We deem it unnecessary to go into a detailed discussion of this bill. As explained by the court there seems to be no merit in this matter. There was a sharp contention about some of the matters incident to the shooting and location of the parties, and the wounds, etc., that would justify the court in permitting the coat to be shown to the jury. There was little, if any, blood on the coat, and it was introduced for the purpose indicated by the court.

The court gave the following charge, which appellant contends was erroneous: "Under the facts proven in this case, John S. Patterson as Commissioner of Banking and Insurance of the State of Texas, had the right, under the laws of such State, to close the Farmers & Merchants State Bank of Teague and take charge of its affairs at the time he was shot." This is not a charge upon the weight of the evidence. Mr Patterson was shown to be the Banking Commissioner. This did not form an issue. There was no controversy about this and it was not only proved by all the testimony but was a conceded fact, and that he was at appellant's bank at the time he was shot as such Commissioner looking after the affairs of the bank. Being such Commissioner, he was authorized under the law to close the bank where the conditions justified such action. The legal proposition is, that as such Commissioner he had the authority to close the bank. The law clothed him with such authority, and it is not a charge upon the weight of the evidence, but is a charge directly stating the law as enacted by the Legislature. Even if it was a proposition of evidence and not of law, still this court has held in numerous decisions that where there is no issue on a given fact but it is conceded and proved without contradiction that such fact exists, then it would not be an assumption for the court to assume in his charge the existence of such fact. We deem it unnecessary to go into a discussion of this question further.

The court's charge on self-defense is criticised. It is as follows: "A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence you believe the defendant killed the said John S. Patterson as charged, but further believe that at the time of so doing the deceased had made, or that it reasonably appeared to the defendant that he had made or was about to make an attack on him,

real or apparent, which, from the manner and character of it, caused him to have a reasonable expectation of death or serious bodily injury and that acting under such reasonable expectation or fear, the defendant shot and killed the deceased, then you should acquit him,· or, if you have a reasonable doubt thereof you will acquit him."

The objection is that this charge does not directly apply the law to the facts, and that the charge was confusing rather than elucidating. We are of opinion that under the facts of this case these exceptions are not correctly taken. Such charge is ordinarily sufficient. Appellant's testimony raising the issue of self-defense was testified by himself and his language in this connection is as follows: "I was talking to Mr. Patterson, pleading with him,—telling him that if he closed the bank I would lose everything I had on earth, and it would not hurt him any to let it stay open three days and they run it; I told him that time and time again—just talking to him—everything would be lost. After making that talk to him three or four times, we got nearly to the door, just walking along. I do not know where McKinnon was; he was not there. When Mr. Patterson got nearly to the door he turned around, and I told him to come back and sit down and talk it over and let's get together and let us have something so as not to be wiped off the face of the earth, like the closing of the bank. He just turned around and then said, 'Both of your boys have lied to me, and I would not believe a damn thing you say.' I said, 'That is mighty hard to take,' and he said, 'You can take that, or worse.' J. E. Watson remarked, 'Look out, papa,' and when he said 'look out, papa,' I just grabbed the gun and shot. I did not know whether I hit him or not. Q. What did you see, if anything, when Eddie said, 'Look out, papa'; what did you see with reference to Mr. Patterson? A. He had his right hand right in this shape (defendant indicating by putting his thumb inside the right top side of waistband of trousers, fingers outside). I was not looking at his hand, and when I looked I saw it just like that, and that is when I shot. Mr. Patterson was standing on inside of the bank right close to the left door, and went out instantly after I shot. The windows were all shaded, as they had been left. Q. What did you next see and do? A. I just turned around a little, and Mr. McKinnon was coming at me, and I shot at him as he was coming at me. He said something,—I don't know what he said; I did not know whether I hit him or not. I shot a time or two more; I really can not tell what I did do. I did not know where Mr. McKinnon was standing when I shot Mr. Patterson; did not observe him standing where Mr. Patterson was; I first observed him standing over to my left." This is the defendant's theory of the shooting.

The State's testimony is to the effect that Patterson had just stepped out of the bank building before T. R. Watson shot him. Such is McKinnon's testimony. He further states: "I came right out from behind the fixtures to post this notice, and the three Watsons came right

out with me, and Mr. Patterson was coming ahead, and he made the remark that he was going to supper. The last time I saw Mr. Patterson he was standing with his fingers hooked in his trousers, in the waistband of his trousers, like this. He had on a linen suit, it was a hot day and he did not have on a vest; just a linen coat and trousers and holding his pouch in the fingers of his right hand. That pouch was a leather pouch, that's the kind that is used to carry papers in; I imagine it was eighteen inches long or something like that, made of black leather. I don't remember Mr. Patterson saying anything when the shots were fired. He did not say anything as far as I know. I would say that the defendant was approximately four or five feet from Mr. Patterson when he shot; he was right on him; it burned his face, the powder. I did not say anything to the defendant or to J. E. Watson as Mr. Patterson stepped out of the bank. I had not done anything at the time the defendant turned the gun on me, I said nothing to him, only I was posting the notice on the door. I had put on my coat just a few minutes before I went on the outside, and I was using my hands there in the plain sight of the three of them posting the notice on the door."

So it will be seen that Patterson at the time he was shot had the thumb of his right hand in the waistband of his trousers and his fingers hanging down. McKinnon's testimony shows that Patterson's right thumb was fastened in the waistband of his trousers, and with the remainder of his fingers he held this leather pouch or grip. The testimony shows that Patterson had the grip in his hand and left the place of the shooting with it in his hand. It is more than questionable that the issue of self-defense was raised, even by the testimony of appellant. Just prior to the shooting the parties seem to have been discussing with Patterson the propriety of their being given three days in which to straighten up their bank matters, and being informed by Patterson of the failure heretofore under promise to do so and that he purposed to close the bank without further trouble, and started out of the bank, and then as he passed out was shot. If self-defense was in the case from this testimony, then we are of opinion the charge sufficiently applied the law in regard to that phase of the case.

There are forty bills of exception in the record, and these cover over 700 pages of this very voluminous transcript. The statement of facts contains an additional 600 pages, and the original bill of exceptions contains something over 300 pages. Many of the bills have been treated in a general way as bearing upon the same subject matter. To have treated each bill separately and gone into all details of appellant's contentions would have required an unnecessary voluminous opinion without resulting good.

Finding no reversible error in the record it is ordered that the judgment be affirmed.

*Affirmed.*

PRENDERGAST, JUDGE.—When this cause was submitted, the oral argument impressed me that some errors had been committed on the trial. Since the submission I have had no opportunity to read and study this very voluminous record.

Therefore, I am not now prepared to express any opinion, and for the present do not express any.

[Reached Reporter October, 1918.]