### P. R. SCHWARZ V. THE STATE.

No. 20048.   Delivered January 4, 1939.
Rehearing Denied February 8, 1939.

The opinion states the case.

*Horace Shelton* and *Earl Shelton,* both of Austin, and *Leonard Brown,* of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, JUDGE.—Appellant was indicted by the grand jury for keeping and exhibiting for the purpose of gaming a policy game, and was convicted therefor and his punishment assessed at two years confinement in the penitentiary.

We find no bills of exception in the record, but we do find a motion to quash the indictment because the same is alleged to be duplicitous because it alleges that appellant did keep and exhibit a policy game, thus alleging two separate and distinct offenses in its one and only count.

The general rule relative to duplicity in an indictment seems to be based on the proposition as to whether or not two separate and distinct criminal acts are charged with different penalties attached thereto. Mr. Branch says on page 259 of his Penal Code: "Duplicity is the joinder in the same count of two or more separate offenses, or the joinder in the same count of two or more phases of the same offense where the punishment is different. To be bad for duplicity, more than one such offense or phase must be completely alleged or the incomplete allegations may be rejected as surplusage. Henderson v. State, 2 Texas Crim. App. 88; Hickman v. State, 22 Texas Crim. App. 441; 2 S. W. 640; Hammons v. State, 29 Texas Crim. App. 448, 16 S. W. 99; Johnson v. State, 177 S. W. 490."

We quote from the case of Cupp v. State, 285 S. W. Rep. 322: " * * * appellant contends that the court erred in failing to sustain said motion to quash because the indictment alleged that the appellant 'knowingly made and caused to be made' in a book belonging to said bank said alleged false entries, and that said allegation was duplicitous, in that it did not affirmatively state whether appellant made said entries or caused same to be made. We think there is no merit in this contention. This is the usual way of alleging many offenses, and properly so, according to our view. Pelz v. State, 89 Tex. Cr. R. 166, 230 S. W. 154." Also see Todd v. State, 229 S. W. Rep, 515.

In our judgment it was proper pleading to allege that appellant kept and exhibited a policy game.

The facts under which this conviction was had are substantially as follows: The appellant had a number of "writers" as they were called, or solicitors, equipped with blank books, whose duty it was to solicit wagers on certain drawings. A person desiring to bet on such drawing would select three numbers from 1 to 78, and in order to win at the drawing, these three

numbers must be drawn. A five cent bet, in the event of these three selected numbers appearing, would win $10.00, a ten cent bet would win $20.00, and a twenty cent bet would win $40.00, providing all three numbers appeared in the list at the drawing. A leather or rubber receptacle in the form of a bottle was provided, and in such bottle there was placed marbles numbered consecutively from 1 to 78, and having been shaken up, 12 marbles were drawn therefrom and placed on a printed list. If the three numbers on the ticket that the bettor had purchased appeared on such printed list of twelve numbers, then appellant paid such bettor according to the amount bet thereon as above set forth.

All this paraphernalia was found in appellant's residence, such as order books, records, marbles, bottle and a small printing press, money, a bunch of negroes, envelopes in which there were tickets and money, rubber stamps, etc. The printing press seemed to have been a disappearing one, as there was a trap door in the closet which could be lifted, and the press lowered into a hole in the ground, and then covered with the trap door. There also seemed to have been a peculiar kind of table which had some use at the time the drawing of the numbers was made from the bottle.

Appellant's contention seems to be that he was guilty of running a lottery, which is a misdemeanor, and was therefore not guilty of keeping and exhibiting a policy game.

Art. 619, Penal Code, reads as follows: "If any person shall directly, or as agent or employe for another, or through any agent, or agents, keep or exhibit for the purpose of gaming, any policy game, any gaming table, bank, wheel or device of any name or description whatever, or any table, bank, wheel or device for the purpose of gaming which has no name, or any slot machine, any pigeon hole table, any jenny-lind table, or table of any kind whatsoever, regardless of the name or whether named or not, he shall be confined in the penitentiary not less than two nor more than four years regardless of whether any of the above mentioned games, tables, banks, wheels, devices or slot machines are licensed by law or not. Any such table, bank, wheel, machine or device shall be considered as used for gaming, if money or anything of value is bet thereon."

It will be noticed from the above that keeping a policy game is denounced by statute, separately and distinctly and outside from a gaming table or bank, wheel or device, and in our judgment it is not necessary to have such game connected with a table, bank, wheel or device. The keeping of such

policy game is denounced regardless of how the same is kept or exhibited, it only being necessary to show that such game was kept. While the statute does not set forth what particular facts are necessary to constitute the constituent elements of keeping a policy game, we feel sure the legislature meant what was then and is now known as wagering at a game made up on the appearance of numbers, and the appearance of such numbers being governed by chance. Such appearance of such numbers may be governed by a scheme denominated as a lottery, or by some other scheme devised by the fertile brain of the keeper of such game; but the mere fact that a portion of such scheme might partake of a lottery, in our opinion, would not control the whole matter to such an extent that a policy game would fall under the statutory definition and punishment of a lottery. In our opinion the lottery feature of the game is merely the subject of the wager, that is when a drawing is had in a lottery, such drawing is for the purpose of determining by chance who shall receive the prizes or money provided therein. Not so in a policy game. In such game the numbers to be drawn in such lottery drawing are used for the purpose of wagering, based upon whether such numbers selected by the bettor will appear at such drawing. The bettor has no interest in any prize drawn in a lottery; he only is interested in what numbers come out of this bottle, and which is but an incident of the game. A policy game is not defined any further by law than to prohibit the same. It is commonly known as the game of numbers, and it is not necessary to attempt to further define the same. In State v. Carpenter, 22 Atl. Rep. 497, the Supreme Court of Connecticut held that in a city ordinance prohibiting the use of a game known as "policy" it was not necessary to define the game of policy. Also "The term 'policy' is well understood as meaning a particular kind of game played in a particular kind of way." State v. Wilkerson, 70 S. W. 478, 170 Mo. 184.

" 'Playing policy' is used to designate a gambling game which is operated by the sale of certificates which entitles the holder thereof to select three numbers. A large number of numbers are placed in a box and three numbers are drawn therefrom, and the certificate holder who holds the certificate for such numbers receives a prize in money much larger than that paid for the certificate." Six Words and Phrases, first series, page 5443; State v. Mercantile Ass'n., 25 Pac. 984, 11 L. R. A. 430.

In State v. Cronin, 88 S. W. Rep. 604, the Supreme Court of Missouri upheld a conviction on facts similar in most respects to those in the instant case as constituting the playing of policy; therein it is also said that it was necessary in an indictment to

further define what was meant by a "policy," nor in what manner a "policy" was made or exhibited.

We further note that a policy game is a thing known and defined by our dictionaries. Webster's International Dictionary defines "policy" as "a method of gambling by betting as to what numbers will be drawn in a lottery."

It is our judgment, and we so hold, that although the policy game may partake of some of the elements of a lottery, at least in so far as the drawing of the numbers are concerned, nevertheless such a game with its constituent elements has been denounced as a separate and distinct offense, punished as a felony, and does not fall within the punitive provisions provided for the establishment of a lottery. That the appellant was keeping such a game appears to be plainly shown from the facts.

The judgment is accordingly affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

CHRISTIAN, JUDGE.—Appellant reiterates his contention that he was guilty of running a lottery and was therefore improperly convicted of keeping and exhibiting a policy game. In support of his contention that the game described in the original opinion is not a game of policy, appellant cites Francis v. United States, 47 L. Ed. 508, in which the indictment charged Francis with conspiring to cause to be carried from one state to another certain certificates and instruments "purporting to be and to represent chances, shares, and interests in the prizes thereafter to be awarded by lot in the drawing of a lottery, commonly known as the game of policy."

The statute under which the prosecution proceeded provided as follows: "That any person who shall cause to be brought within the United States from abroad, for the purpose of disposing of the same or deposited in or carried by the mails of the United States, or carried from one state to another in the United States, any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, so-called gift concert, or similar enterprise offering prizes dependent upon lot or chance, or shall cause any advertisement of such lottery, so-called gift concert, or similar enterprises offering prizes dependent upon lot or chance, to be brought into the United States, or deposited in or carried by the mails of the United States, or transferred from one state to another in the

same, shall be punishable in the first offense by imprisonment for not more than two years or by a fine of not more than $1,000, or both, and in the second and after offenses by such imprisonment only."

28 Stat. at L. 963, U. S. Comp. Stat. 1901, p. 3178.

In the course of the opinion Mr. Justice HOLMES stated the facts before the court, as follows: "It appears that the lottery in question had its headquarters in Ohio and agencies in different states. A purchaser, or person wishing to take a chance, went to one of these agencies, in this case in Kentucky, selected three or more numbers, wrote them on a slip, and handed the slip to the agent, in this case to the defendant Hoff, paying the price of the chance at the same time, and keeping a duplicate, which was the purchaser's voucher for his selection. The slip in this case was taken by the defendant Edgar to be carried to the principal office, where afterwards, in the regular course, there would be a drawing by the defendant Francis. If the purchaser's number should win, the prize would be sent to the agency and paid over. The carriage from one state to another, relied upon as the object of the conspiracy, and as the overt act in pursuance of the conspiracy, was the carriage by Edgar of slips delivered to Hoff, as above described."

We are unable to agree with appellant that, in reversing the judgment of conviction, the court held that the game above described was not a game of policy, as alleged in the indictment. The court merely held that the slips carried from Kentucky to Ohio were not papers purporting to be or represent a ticket or interest in a lottery. It is true that the court used the term "lottery." However, it does not follow that the use of such term was an expression on the part of the court that the game described was not a game of policy. We quote from the opinion, as follows: "The assumption has been that the slips carried from Kentucky to Ohio were papers purporting to be or represent a ticket or interest in a lottery. But in our opinion these papers did not purport to be or do either. A ticket, of course, is a thing which is the holder's means of making good his rights. The essence of it is that it is in the hands of the other party to the contract with the lottery as a document of title. It seems to us quite plain that the alternative instrument mentioned by the statute, viz., a paper representing an interest in a lottery equally is a document of title to the purchaser and holder,—the thing by holding which he makes good his right to a chance in the game. But the slips transported, as we have pointed out, were not the purchasers'

document. It is true that they corresponded in contents, and so in the one sense represented or depicted the purchasers' interests. But 'represent' in the statute means, as we already have said in other words, represent to the purchaser. It means stand as the representative of title to the indicated thing, and that these slips did not do. The function of the slips might have been performed by descriptions in a book, or by memory, if the whole lottery business had been done by one man. They as little represented the purchaser's chances as the stubs in a check book represents the sums coming to the payees of the checks."

Appellant concedes that State v. Cronin, 88 S. W. 604, supports the contention of the state herein that the game we have described in the original opinion was a game of policy. He insists, however, that the decision in that case is not in harmony with the holding of Francis v. United States, supra. As already pointed out, we are of opinion that there is nothing in the case last mentioned which can be taken to militate against the conclusion expressed in the original opinion herein.

Believing that a proper disposition of the appeal was made in the opinion upon original submission, we are constrained to overrule appellant's motion for rehearing.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.