# JUNE 7, 1944

### RUFUS CAGLE V. THE STATE.

No. 22490. Delivered February 16, 1944.
State's Motion Granted April 19, 1944.
Appellant's Motion for Rehearing Denied June 7, 1944.

GRAVES, Judge, dissenting from original opinion.

The opinion states the case.

*J. J. Collins, of Lufkin,* and *H. J. Bernard, Henry E. Kahn, E. T. Branch,* and *J. E. Winfree,* all of Houston, for appellant.

*A. C. Winborn,* Criminal District Attorney, and *King C. Haynie,* Assistant Criminal District Attorney, both of Houston, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Under an indictment charging Rufus Cagle and Frank Cagle, jointly, with the offense of keeping and exhibiting a policy game, under the provisions of Art. 619, P. C., Rufus Cagle was separately tried, convicted, and his punishment assessed at confinement in the state penitentiary for a term of two years.

The term "policy game" is not defined by statute. By judicial interpretation, it is the game of betting upon the appearance of numbers, the bettor betting against the keeper that certain numbers selected by the bettor will appear out of a list of numbers, usually from 1 to 78, drawn or to be drawn by the keeper, by chance or otherwise.

It was the State's contention that Frank Cagle and Rufus Cagle were jointly operating, that is, keeping and exhibiting, a policy game known as "Big Four."

It appear that there were two drawings of numbers each day, except Sunday: one in the forenoon and the other in the afternoon. The closing time for the taking of bets was about noon and 6:00 P. M., respectively. Bets were made through "writers," there being about forty-seven so engaged in writing for the "Big Four." Eleven of these "writers" testified for the State upon the trial of this case. A canvas bag, with a number thereon, was furnished each writer. This number identified the writer with the operators of the game. Each writer would contact the individual bettor and would receive from him the numbers selected and the amount bet on that selection. Bets could be made upon the appearance of the numbers, in several different ways, the odds to the winner being governed by the particular method employed. The writer would make an original of the selection made by the bettor, which he placed in the canvas bag, together with the amount so bet, after deducting twenty per cent thereof for himself. A copy of the selection was retained by the bettor and the writer. Thus the keeper of the game, the writer, and the bettor were enabled, after the list of numbers had been drawn and published, to determine whether the bettor had won or lost. About closing time for each drawing, the writer would "close his books," that is, he would stop taking bets for that drawing, and would deliver his canvas bag to, what we will term, the "collector," who, in this case, was one Ivory Slater. After taking up the bag, Slater would, within a short time, return, to the writer, a canvas bag, in which was a printed copy of the numbers drawn for the period just closed. With this list, the writer would then make payment to those bettors who had won. The amount so paid out by the writer was deducted by him from receipts of subsequent bets. No writer knew the identity of, or had contact with, the keepers or exhibitors of the game. All instructions and communications between them were made by and through notes or memoranda placed in the canvas bag from time to time. Among such communications transpiring were that the writers were directed to furnish their social security numbers, and were given the name and telephone number of a lawyer to call in the event they were arrested, and who would furnish bail for them.

The foregoing facts are shown, primarily, by the testimony of the eleven writers who testified upon the trial of the case, and who referred to their duties as selling lottery tickets, and who would have testified that they were engaged in selling lottery tickets.

The "Big Four" had been thus operating in Harris County for more than a year prior to this prosecution.

Appellant insists that such facts do not show keeping or exhibiting a policy game; and that, if any offense were shown, it was that of a lottery, and for which the prosecution should have been instituted.

With this contention we are not in accord. It is true that the numbers may have been drawn by chance, and that other elements of the offense of a lottery may have been shown to exist; yet the facts also showed all the constituent elements of a policy game. Schwarz v. State, 124 S. W. (2d) 392, 136 Tex. Cr. R. 260; Hill v. State, 158 S. W. (2d) 810; Canizares v. State, 157 S. W. (2d) 385; Adams v. New York, 192 U. S. 585, 48 L. Ed. 575, 24 S. Ct. 372. It must be remembered that it is the province of the State to carve out of, and to prosecute for, any offense growing out of a single transaction, and that it does not lie with the accused to direct the State in that selection. Having concluded that the facts show that the offense of keeping and exhibiting a policy game was committed by someone, it remains to be determined whether the facts show that the appellant, Rufus Cagle, was criminally connected therewith; and, as to this, these additional facts appear:

Several weeks prior to January 20, 1942, detectives of the City of Houston began a systematic trailing and watch of the acts, conduct, and movements of Frank Cagle, Rufus Cagle, and Ivory Slater; as a result of which they were enabled to determine that each day, about the closing time or deadline for the taking of bets by the writers, Rufus Cagle would go to a house situated on "Lillian Road" and would leave said house, with a suitcase, which he would deliver to Frank Cagle, and, at the same time, would receive, from Frank Cagle, a suitcase; that, about said closing time, Frank Cagle would contact Ivory Slater, and would receive from him a suitcase; and that, thereafter, Frank Cagle would deliver, to Ivory Slater, the suitcase, or one similar, that Frank Cagle had received from Rufus Cagle.

On the night of January 20, 1942, peace officers, by virtue of a search warrant, made a search of: the "Lillian Road" house, the residence of Frank Cagle, and the residence of Rufus Cagle (the appellant).

The "Lillian Road" house although having some household furniture in some of the rooms, did not appear to be occupied

by anyone as a place of residence. In this house, they found: a hand printing press; sheets of paper of the same kind and size as those upon which the numbers were printed and delivered to the writers; two grips, or suitcases, containing manila envelopes similar to those used by some of the writers; canvas bags, with numbers thereon, and identified by some of the writers as having been assigned to them; and complete equipment for the drawing and printing of the numbers on the printed lists.

In Frank Cagle's home, they found: duplicate copies of "Employer's Tax Return" to the government, showing that Frank Cagle had made returns of taxable wages paid by him, as employer, to his employees, which listed, among others, the names of the eleven writers who testified upon the trial, together with those of Ivory Slater and Rufus Cagle. Something like $9,400.00 in cash was found in a small safe.

In Rufus Cagle's home, they found, in the attic thereof, a well-equipped office, access to which was gained by means of a movable stairway. In that office, they found: a large quantity of slips of paper, which were identified by the writers as being the originals written by them in taking bets for the "Big Four," and which slips of paper showed the numbers selected by the bettors, and which were, by the writers, placed in the canvas bag assigned to each of them; several of the canvas bags bearing the numbers, and which were identified by the writers as having been assigned to and used by them in reporting the bets; a suitcase similar to that the officers had seen passed between Ivory Slater, Rufus Cagle, and Frank Cagle; a canvas-back book, in which were listed the names of various people, including the names of the eleven writers, opposite each of which was a social security number and amounts shown in figures; also another book, corresponding, in many respects, with the canvas-back book.

In addition to the testimony showing the result of the searches mentioned, there were introduced in evidence the monthly returns made by Frank Cagle to the Texas Unemployment Compensation Commission, showing the employees' names and the numbers assigned and the amounts paid to his employees. The names of the eleven writers and that of Ivory Slater were included therein.

The foregoing constitutes a statement of the facts upon which the State relied to connect Frank Cagle and Rufus Cagle with the crime charged.

The appellant did not testify as a witness in his own behalf, nor did he offer any affirmative defensive testimony.

The facts are sufficient to show—and a reasonable deduction to draw therefrom is—that it was appellant's job or duty, in connection with the unlawful enterprise: to furnish his home as the headquarters and office therefor; to go to the "Lillian Road" house, and there to draw the numbers and to print the tickets showing the winning numbers, and to get them into the hands of Frank Cagle, who in turn would deliver them to Ivory Slater, by whom they would be distributed to the writers; and, after Frank Cagle had received, from Ivory Slater, the suitcase containing the canvas bags with the money so bet and the slips of paper showing the selections of the bettors, he would deliver same to Rufus Cagle, who would carry them to the attic of his residence, for entry and checking.

The conclusion is reached that the jury was warranted in concluding that appellant was a principal to the commission of the offense charged in that, at the time of the commission of the crime, he was charged in doing his part in furtherance of the common design. Having so concluded, it follows also that the trial court was warranted in submitting the case to the jury under the law of principals. Appellant's contrary contention is overruled. The trial court gave the following instruction to the jury:

"5. You are charged that the game of betting on numbers or combinations of numbers appearing on the tickets or slips of paper described and admitted in evidence constitutes a policy game."

This charge was objected to as being, among other things, upon the weight of the evidence. The effect of the charge was to tell the jury that the evidence in this case showed a policy game.

As we have pointed out, the facts were undisputed; and, as a matter of law, such facts did show the keeping and exhibiting of a policy game by someone. It follows that the trial court was authorized to so construe the facts, under the rule that the question at issue was one of law for the court's determination. Queen v. State, 246 S. W. 384, 93 Tex. Cr. R. 173; Hegman v. State, 227 S. W. 954, 88 Tex. Cr. R. 548; Prendergast v. State, 57 S. W. 850, 41 Tex. Cr. R. 358; Martin v. State, 162 S. W. (2d) 722; Watson v. State, 205 S. W. 662, 84 Tex. Cr. R. 115.

We come now to a discussion of the most difficult question in the case, and that is the sufficiency of the affidavit and search warrant to authorize the search of appellant's home, and the introduction in evidence of the result of the search. The affidavit and search warrant read as follows:

"STATE OF TEXAS )
COUNTY OF HARRIS )

"Before me, the undersigned authority, on this day personally appeared the undersigned affiants who, being by me duly sworn, upon oath state THAT a certain place in Harris County, Texas, described as *2102 Brannard St. a red brick, one story house in the city of Houston, Texas,* and being the premises under the control and in charge of *unknown parties whose names and descriptions are known to affiants* is a place where *implements* are kept for the purpose of aiding in the commission of offenses as defined by the Penal Code of the State of Texas, to-wit: The establishment and operation of a lottery, and *the keeping and exhibiting of a policy game.*

"E. M. Collins,

"T. B. Morris, Affiants

"SUBSCRIBED AND SWORN TO BY THE ABOVE NAMED AFFIANTS this the *20* day of *January,* A. D. 1942.

"W. C. Ragan, Justice of the Peace

"Precinct Number One Harris
County, Texas."

The warrant issued under and by virtue of said affidavit reads as follows:

"STATE OF TEXAS )
COUNTY OF HARRIS )

"TO THE SHERIFF OR ANY CONSTABLE OF HARRIS COUNTY,— GREETINGS:

"WHEREAS, a complaint on oath and in writing, in accordance with law, has this day been made before me alleging that the premises described as *2102 Branard Street, Red Brick, one story house in the City of Houston, Texas* and being the premises under the control of and in the charge of *unknown parties, whose names and descriptions are unknown to the affiants,* as a place where implements are kept for the purpose of aiding in the commission of offenses, as defined by the Penal Code of the

State of Texas, to-wit: The establishment and operation of a lottery, and *the keeping and exhibiting of a policy game.*

"You are therefore hereby commanded to enter immediately and search the above described premises for implements used in aiding in the commission of offenses, as defined by the Penal Code of the State of Texas, to-wit: The establishment and operation of a lottery, and *the keeping and exhibiting of a policy game* and to take possession of same, and you are further commanded to arrest the said *unknown parties, whose names and descriptions are unknown to affiants* alleged to be the person in charge of said premises, and to arrest all other parties found in said premises or making their escape therefrom.

"HEREIN FAIL NOT, but have you then and there, this warrant within three days from its issuance with your return thereon, showing how you have executed the same.

"WITNESS my hand this the *20th* day of January, A. D. 1942.

> "W. C. Ragan (signed)
>
> "Justice of the Peace Precinct
>
> "Number *One*, Harris County, Texas."

It will be noted that the affiadavit was made, and the warrant was issued, under the authority of Title 6 of the Code of Criminal Procedure, and particularly under Arts. 304, 312, and 316 thereof, wherein provision is made for the issuance of warrants to search for "implements kept for the purpose of being used in the commission of any designated offense." (Art. 304, C. C. P.) ; and "When it is alleged that implements are kept at a place for the purpose of aiding in the commission of offenses, - - - - - - - - - - - - - - - -." (Art. 312, C. C. P.).

Appellant's attacks on the affidavit and search warrant are: (a) The statutes relied upon do not authorize the issuance of warrants to search for implements used or kept for the purpose of aiding in the commission of the offense of keeping a policy game. (b) If the statutes relied upon do authorize the issuance of such a search warrant, then the affidavit and warrant are insufficient in that they do not describe the implements or kind of implements kept, or alleged to have been kept, for the purpose of aiding in the commission of the offense of keeping and exhibiting a policy game, as expressly required by the statutes relied upon.

Obviously, therefore, a construction of Title 6, C. C. P., and especially Arts. 304, 305, 312, and 316 thereof, together with Art. 633, P. C., is called for.[1]

If we understand appellant's position, it is that, under the provisions of Title 6, C. C. P., and especially under the Articles mentioned, the implements and the only implements for which a search warrant may there issue are those described in Sec. 3 of Art. 305, C. C. P., same being implements for use in forgery and counterfeiting; that special provision is made for the issuance of warrants to search for implements used in gaming and kindred offenses, including the keeping of a lottery and a policy game, by the provisions of Art. 633, P. C.; and that, Art. 633, P. C., being a special statute, it controls over the general statute incorporated under Title 6, C. C. P.

Note is to be taken of the fact that Title 6, C. C. P., was a part of the Original Code of 1856, and that same has remained practically unchanged, while Art. 633, P. C., is a part of the gaming laws passed in 1907.

In so far as the articles mentioned relate to the question of search and seizure, they are in pari materia, and are, therefore, to be construed together, so as to give effect to each; and in the event of a conflict, the special statute will control over

---

[1] Article 304, C. C. P. "Search Warrant"

"A 'search warrant' is a written order, issued by a magistrate, and directed to a peace officer, commanding him to search for personal property, and to seize the same and bring it before such magistrate; or it is a like written order, commanding a peace officer to search a suspected place where it is alleged stolen property is commonly concealed, or implements kept for the purpose of being used in the commission of any designated offense."

Art. 305, C. C . P. "When it may issue

"A search warrant may be issued:

"1. To discover property acquired by theft or in any other manner which makes its acquisition a penal offense.

"2. To search suspected places where it is alleged property so illegally acquired is commonly kept or concealed.

"3. To search places where it is alleged implements are kept for use in forging or counterfeiting.

"4. To search places where it is alleged arms or munitions are kept or prepared for the purpose of insurrection or riot.

"5. To seize and bring before a magistrate any such property, implements, arms and munitions."

Art. 312, C. C. P. "Application to search other places.

the general statute upon that subject. Colley v. State, 158 S. W. (2d) 1014, 143 Tex. Cr. R. 390; Thomas v. State, 91 S. W. (2d) 716, 128 Tex. Cr. R. 628; and authorities cited in 34 Texas Digest Statutes, page 477, Secs. 205-207, incl.

The rule stated has application here in two particulars; these are: (a) in determining the effect of Sec. 3 of Art. 305, C. C. P., wherein a search warrant may issue "To search places where it is alleged implements are kept for use in forging or counter-feiting," in relation to Arts. 304 and 312, C. C. P., wherein a warrant may issue to search a suspected place where it is alleged there are "implements kept for the purpose of being used in the commission of any designated offense." Under Art. 304, C. C. P.) ; and to search any place·suspected of being.one where "implements are kept for the purpose of aiding in the commis-sion of offenses - - - - -" (under Art. 312, C. C. P.) ; and (b) in determining the effect of the Articles mentioned· in relation to Art. 633, P. C.

If Arts. 304 and 305, C. C. P., be construed together, there might be some foundation for the claim that the special enum-erations set out in Art. 305, C. C. P., control over, and constitute a description of, the things authorized to be searched for under Art. 304, C. C. P., as being descriptive of the provision "any designated offense," as contained in that Article; yet in no event could said Article 305, C. C. P., be construed as placing a limitation upon the express provisions of Art. 312, C. C. P., authorizing the issuance of a warrant to search for implements

"A warrant to search any place suspected to be one where stolen goods are commonly concealed or where implements are kept for the purpose of aiding in the commission of offenses may be issued by a magistrate on written sworn complaint, setting forth:

"1. A description of the place suspected.

"A description of the kind of property alleged to be commonly concealed at such place, or the kind of implements kept.

"3. The name, if known, of the person supposed to have charge of such place, when it is alleged that it is under the charge of any one.

"4. When it is alleged that implements are kept at a place for the purpose of aiding in the commission of offenses, the particular offense for which such implements are designed must be set forth."

Art. 316, C. C. P. "To search suspected place

"A warrant to search a suspected place shall be sufficient if it contain the fol-lowing requisites:

"1. That it run in the name of "The State of Texas."

"2. That it describe with accuracy the place suspected.

kept for the purpose of aiding in the commission of offenses, that is, offenses generally.

When the several Articles comprising Title 6, C. C. P., are construed as a whole, no doubt exists in our minds but that the Legislature intended to authorize the issuance of warrants to search for implements kept for the purpose of being used in, or aiding in, the commission of offenses generally, as denounced by the Penal Code of this State. A contrary conclusion would, of necessity, render meaningless the express provisions of Art. 312, C. C. P.

Appellant argues, with much force, that the Articles of Title 6, C. C. P., noted cannot be given the broad construction as announced by us, because of the enactments, by the legislature, from time to time, of special legislation authorizing the issuance of search warrants in connection with certain specific offenses, such as intoxicating liquors (Art. 691 of the Penal Code of 1925), intoxicating liquors under the present Texas Liquor Control Act (Art. 666-20, P. C.), narcotics (Sec. 16 of Art. 725b, P. C.), and gaming (Art. 633, P. C.), which special legislation authorized the issuance of warrants to search not only for the specific property, or contraband articles, but also for the implements used in connection with the commission of offenses relating thereto.

---

"3. That it describe, as near as may be, the property supposed to be commonly concealed in such suspected place, or the implements alleged to be there kept for the purpose of aiding in the commission of offenses, and state the particular offense for which such implements are designed.

"4. That it name the person accused of having charge of the suspected place, if there be any such person, or, if his name is unknown, that it describe him with accuracy, and direct him to be brought before the magistrate.

"5. That it be dated and signed by the magistrate, and directed to the sheriff or other peace officer of the proper county.

Art. 633, P. C. "Justice to issue search warrant

"Upon the filing with any justice of the peace, or any other magistrate, of an affidavit made by a reputable citizen that gaming, betting or wagering, as prohibited by the preceding articles of this chapter is being conducted in any building, room, premises or place, describing the same sufficiently for identification, such officer with whom said affidavit is filed shall immediately issue a warrant commanding the peace officer to whom same is directed to immediately enter and search such building, room, premises or place, and in the event the same is a gaming house, as defined in this chapter, to arrest all parties found therein or making their escape therefrom, and to take possession of any gambling paraphernalia, device or equipment found therein and such officer shall immediately take the persons arrested before the nearest magistrate, and lodge the proper complaint against each person so arrested."

Appellant cites the cases of Greenway. v. State, 131 Tex. Cr. R. 620, 101 S. W. (2d) 569, and Rone v. State, 132 Tex. Cr. R. 23, 101 S. W. (2d) 1017. These cases arose out of the following situation: Upon the passage of the so-called "Dean Law," being Chapter 7 of the Penal Code of 1925, the Legislature, by Art. 691 thereof, expressly provided for the issuance of search warrants thereunder. When the Dean Law was repealed by the enactment of our present "Texas Liquor Control Act," in 1935, no provision was made therein for the issuance of search warrants. Thereafter, the question arose as to whether or not a warrant could be issued to search in connection with violations of that Act. In the cases above noted, we held that no statutory authority existed for the issuance of a warrant to search for intoxicating liquors, and that the authority for the issuance of such a warrant expired with the repeal of Art. 691, P. C., of 1925.

Appellant insists that the effect of such holding is that the provisions of Title 6, C. C. P., did not authorize the issuance of a search warrant in connection with offenses or violations of the law generally, and that Title 6, C. C. P., is, therefore, restricted in its application only to the matters expressly enumerated therein.

In the Greenway and Rone cases, supra, the search sought to be made was for intoxicating liquor; that is, for the contraband article. The question of the right of a warrant to issue to search for "implements" used or to be used in violating the liquor laws was not involved nor was it raised in such case. The provisions of Title 6, C. C. P., do not authorize the issuance of a warrant to search for intoxicating liquor. It follows that the holding in the Greenway and Rone cases, supra, furnishes no authority for the contention that Title 6, C. C. P., does not authorize the issuance of search warrants for "implements" used or to be used in violating the law generally, such question not being involved therein.

It next becomes material to determine whether Art. 633, P. C., is in conflict with the provisions of Title 6, C. C. P., in so far as same relate to the issuance of a search warrant to search for implements used or to be used in gaming, lottery, and policy game cases, so as to exclude the application of said Title 6, C. C. P., to such cases.

Art. 633, P. C., upon its face, provides: (a) for the issuance of a search warrant when an affidavit is made that gaming,

betting or wagering, as prohibited by law, is being conducted in the place desired to be searched; (b) that the warrant issued under such affidavit authorizes the officer to search the place described; and (c) that, if the officer executing the warrant determines that the place so searched is a gambling house, that is, a "place where people resort for the purpose of gaming, betting or wagering" (Art. 631, P. C.), the officer may take, and is directed to take, possession of the gambling equipment found therein.

The construction to be placed upon said statute is that, in so far as gambling equipment is concerned, the right to take possession thereof is limited, first, to a determination, by the officer executing the search warrant, that the place searched is a gambling house. It follows that, under said statute, unless the place is found to be a gambling house, the right to seize the gambling equipment so found does not exist. Art. 633, P. C., thus limits a search for equipment used in committing any offense of gaming to a search of a gambling house, and, as so limited, does not authorize the search for any implements used in the commission of offenses, as we have herein determined exist, under the provisions of Title 6, C. C. P. The conclusion is reached that Art. 633, P. C., is not susceptible of the construction sought to be here applied by the appellant. There may be some provisions of said article subject to question but they are not here involved. What we hold is that Art. 633, P. C., does not furnish the exclusive remedy for the issuance of search warrants to search for implements used in committing the offense of keeping and exhibiting a policy game.

We come now to a consideration of the question of the introduction of the testimony showing the result of the search of appellant's home. As to this, two primary questions are presented; these are:

(a) Is the description of the implements as contained in the affidavit and search warrant sufficient?

(b) If the description be sufficient to authorize a search for implements used in committing the offense charged, did it authorize the seizure, and the introduction in evidence, of the books, slips of paper, and canvas bags so found?

These questions are discussed in the order named.

Art. I, Sec. 9, Constitution of Texas, and Arts. 4, 312 and 316, C. C. P., require that a search warrant, to be sufficient,

must describe the place to be searched and the property to be seized. The primary reason for this is to prevent speculation on the part of the officer executing the warrant as to what property may be seized by him, and to prevent an exploratory search merely for evidence.

As to when property sought to be seized is sufficiently described in the warrant, it appears that the general rule is as follows:

"The description of the property to be seized must vary according to whether the identity of the property or its character is a matter of concern * * * where the purpose of the search is to find a specific property, it should be so particularly described as to preclude the possibility of seizing any other; on the other hand, if the purpose be to seize non-specified property, but any property of a specified character which by reason of its character and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description save as to such character, place and circumstances, is unnecessary and ordinarily impossible." Cornelius on The Law of Search and Seizure, pp. 331-332, sec. 122; State v. Nejin, 140 La. 793, 74 So. 103; Frost v. People, 61 N. E. 1054, 193 Ill. 635, 86 Am. St. Rep. 352; 24 R. C. L. 714.

The rule stated is deemed applicable in the instant case. Here the property desired to be searched for and seized was implements used in aiding in the commission of the offense of keeping and exhibiting a policy game, and was not property of a specific character or which could be described by a specific name or designation. The definition of, and the elements necessary to constitute, the offense of keeping and exhibiting a policy game are so broad that the implements used in committing that offense must, of necessity, depend upon the character thereof, together with the place and circumstances under which they are found. It follows that the description of the implements as contained in the affidavit and search warrant was sufficiently definite to authorize a search therefor, limed, however, by the wording contained in the search warrant, to such implements as are used in committing the offense charged.

The search warrant being sufficient to authorize the search of appellant's home for implements used in aiding in the commission of the offense of keeping and exhibiting a policy game, the remaining question is whether the officers executing the warrant were authorized to seize and to take possession of the

property found therein—especially the books, canvas bags, and private papers offered in evidence by the State. Objections were made to the introduction of such testimony and same are preserved here by proper bills' of exception.

In the final analysis, the fact situation here presented is:

Officers, armed with a search warrant authorizing them to search appellant's home for implements used in aiding in the commission of the offense of keeping and exhibiting a policy game, made a search thereof in his absence, but in the presence of members of his family, and of others; they seized and took possession of, among other things, certain writings, which, upon their face, were nothing more nor less than slips of paper, with numbers written thereon in pencil. On the face of such slips there was nothing to show to what the numbers thereon related, nor the use or purpose for which they were made or possessed. Of the other property seized, that is, the canvas bags and the canvas-back book containing names, numbers and amounts, it is also true that there was nothing on the face thereof that would, in any manner, show or indicate that they were being used in keeping and exhibiting a policy game. It was by other testimony that such property was shown to be connected with the offense charged. This other testimony, which was mainly that of the writers, did show that the articles so seized were used in committing, and were a part of the conspiracy to commit, the offense of keeping and exhibiting a policy game; and, by reason thereof, the articles so seized became and were very material to the State's case. So, the question here presented is whether or not the search warrant-authorized the seizure of the property mentioned and its use in evidence by the State.

The courts, both state and federal, have been very zealous in guarding and protecting the security of a man's home against unreasonable searches and seizures, as guaranteed in our Bill of Rights (Art. I, Sec. 9, Constitution of Texas) and in the 4th Amendment to the Federal Constitution. A liberal construction has been adopted to preserve that right.

The Legislature of this State, in order to further protect and to safeguard these guarantees, has enacted special legislation upon the subject (Art. 727a, Vernon's C. C. P.), which reads as follows:

"No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution of the United States of America,

shall be admitted in evidence against the accused on the trial of any criminal case."

Express authority for the passage of such statute exists under the rule that it is within the power of the State to prescribe the evidence which is to be received in the courts of its jurisdiction. Fong Yue Ting v. United States, 149 U. S. 698, 37 L. ed. 905, 13 S. Ct. 1016. The effect of said Art. 727a, C. C. P., is that, under the circumstances here presented, if the testimony showing the result of the search was obtained in violation of the Constitution or laws of this State, or of the 4th or 5th Amendment to the Federal Constitution, its receipt in evidence is prohibited. Such being true, the decisions of the Supreme Court of the United States upon the question here presented should be first consulted; and, where applicable and controlling, they should be followed. We think that the case of Gouled v. United States, 255 U. S. 298, 65 L. ed. 647, 41 S. Ct., 261, is controlling. As we construe the holding in that case, it is that, under the 4th Amendment to the Federal Constitution, search warrants "may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding, but that they (search warrants) may be resorted to only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or when a valid exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken."

Implements used for gaming, including implements used in keeping and exhibiting a policy game, fall within the class for which search warrants may issue.

The slips of paper with the pencil memoranda thereon, the canvas bags, the suitcases, policy slips and printing press were, under the facts here presented, implements used in keeping and exhibiting this particular policy game. All articles found appear to be included in this classification save the one hereafter considered.

In Adams v. New York, 192 U. S. 585, 24 Sup. Ct. Rep. 372, 48 L. ed. 575, is found the following statement from the Supreme Court of the United States:

"The right to issue a search warrant to discover stolen property or the means of committing crimes, is too long established

to require discussion. The right of seizure of lottery tickets and gambling devices, such as policy slips, under such warrants, requires no argument to sustain it at this day. But the contention, is that, if in the search for the instruments of crime, other papers are taken, the same may not be given in evidence."

The test is not the nature of the property seized but whether such property was by the accused used in perpetrating the offense of keeping and exhibiting a policy game. United States v. Thomson, 129 A. L. R. 1291. If the property was so used or was usable for such purpose, it was admissible in evidence. However, if property was seized which was not used or usable in committing the offense but was only of evidential value in establishing accused's guilt of the crime charged, such evidence should, upon objection thereto, have been excluded. Upon page 1296 of 129 A. L. R. appears the following headnote:

"Comment Note—Illustrations of distinction, as regards search and seizure, between papers or other articles which merely furnish evidence of crime, and the actual instrumentalities of crime."

Under this note will be found numerous cases illustrating the distinction mentioned.

We conclude that no error was committed by the trial court in admitting evidence regarding such articles, papers and means as appear to have been used or usable in securing bets and otherwise developing and operating the unlawful enterprise of running a policy game as the same was, conducted in the particular instance now before us.

Bill of Exception No. 11 reveals that one of the officers who executed the search warrant testified, over objection, that, in the attic of appellant's home, the officers found a canvas-back book which contained the names and social security numbers of employees, among others, of Rufus Cagle (appellant) and the "writers" who testified.

We are at a complete loss to discover how it would be possible for a book containing social security numbers of purported employees to be used in conducting a policy game, or to be classed as an implement for such purpose.

However, it was a rather cogent evidential circumstance against appellant that there was found in his house a book con-

taining the social security numbers of the "writers" heretofore mentioned, who had testified that, in the canvas bags delivered to them by one Ivory Slater, there was a written request that they furnish their social security numbers; and especially significant in view of the fact that, although none of said "writers" came in personal touch with Frank Cagle, yet the evidence showed that he made returns to the Texas Unemployment Compensation Commission showing, among other employees, the eleven "writers," Ivory Slater and appellant, with the numbers assigned, and the amounts paid to each. Finding the book containing the said social security numbers in appellant's home tended to tie him into the enterprise with which Frank Cagle, Ivory Slater and the "writers" were connected. Being solely of evidential value against appellant, but wholly disconnected with the operation and development of the policy game, the evidence mentioned should have been excluded.

The prosecution suggests that, because evidence went into the record, without objection, that Frank Cagle made the return to the Texas Unemployment Compensation Commission regarding the social security matters of the "writers" and other employees, the admission in evidence of the finding of the book containing practically the same information was not harmfully erroneous. It must be borne in mind that Rufus Cagle (appellant) was on trial—not Frank Cagle, the party who made the reports.

For the error in not excluding the evidence mentioned, the judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by a majority of the Court.

F. L. HAWKINS, Presiding Judge.

TOM L. BEAUCHAMP, Judge.

GRAVES, Judge, (dissenting).

My Brethren have decided this cause should be reversed solely and alone because of the admission of the contents of a certain black book containing the social security numbers of ten of the eleven "writers" testifying for the State therein. I am not in accord with such reversal. I shall briefly review the authorities given for such a reversal.

In the Go Bart Case, 75 L. Ed. 382, a search was made to ascertain whether or not Gowen & Bartles were engaged in a conspiracy to violate the liquor laws, under an invalid warrant, the warrant being one of arrest and not a search warrant, but merely to find out whether or not these men were engaged in an illicit conspiracy to violate the prohibition laws.

The search of the house and papers was held under no warrant of any kind. The officers arrested the accused without a warrant; they searched his person and then proceeded to search his house and papers. The Supreme Court upheld the search of his person, but not that of his house and papers.

In the Adams Case, 48 L. Ed. 575, the court held:

"The right to issue a search warrant to discover stolen property or the means of committing crimes is too long established to require discussion. The right of seizure of lottery tickets and gambling devices, such as policy slips, under such warrants, requires no argument to sustain it at this day. But the contention is that, if, in the search for the instruments of crime other papers are taken, the same may not be given in evidence."

The Gouled Case, 65 L. Ed. 650, is of no especial value herein. The paper taken from the Gouled office was stolen therefrom by a secret service man, and no warrant of any kind was present relative to its production.

We find in Cornelius on Search & Seizure, p. 160, note that: "In Collins v. Leans, 68 Cal. 284, 9 Pac. 173, the court held that in executing a warrant to search the premises of defendant for lottery tickets, the officer was justified in taking any tickets of that character discovered in defendant's house, and he was not entitled to a return thereof."

Again, same page, the Adams Case is referred to, in substance, as holding that together with the seizure of 3500 policy slips, certain other private papers tending to identify defendant with the place, was not unreasonable, and the papers were admissible.

Again, the same work on page 385 says: "In a celebrated case decided by the Unites States Supreme Court (Adams v. New York, supra), it was held that policy slips of an evidentiary nature, seized in the execution of a search warrant for gambling paraphernalia, was admissible in evidence."

The game of policy can be played in many ways. Usually, however, same is begun by the issuance of a policy slip, which is evidence in the way of a receipt to the bettor as to what certain, numbers he wagers will appear in a drawing to be later held. This slip is a portion of the game, and constitutes one step, usually the initial one, in its being played. The next step in such game is the conveyance of this knowledge to the person in charge of the game of the bettor's choice of numbers. Of course this may be done in numerous ways. In the present instance, it was done by placing a copy of the purchased policy slip in a bag, numbered for identification. This bag, with its contents, was then conveyed by divers means to the central point of the drawing, the game being incomplete until the drawing takes place, and notice of the appearing numbers being given. In the event that the policy slip holder has selected the proper numbers that were drawn, he receives a reward for his astuteness; if his numbers do not appear, the keeper of the game pays him nothing. In order to notify the different holders of policy slips as to what numbers appeared at this drawing, such numbers are usually printed on a slip of paper, and such printings are open to the inspection of the interested.

The implements seized by the officers under their search warrant, in the main, consisted of a printing press, evidently a portion of the gambling paraphernalia and of use in announcing to the interested public the numbers that appeared in the recent drawing, equivalent to telling the lucky holder of the slip that he was a winner, and would be paid his winnings; the many policy slips seized, many of them identified by the persons making same, evidencing the bet placed by the customer; the bags used by the policy writers in their communications with the persons who were keeping or running such game and which were contained in suit cases similar to one seen in the possession of appellant prior to his arrest. Again, a certain book which was found by means of the search warrant which bore the names of all, save one, of the writers who testified herein, and in connection with such names appeared each individual writer's social security number, such facts evidencing the employment of these writers by appellant's brother, with whom appellant was claimed to be associated as a principal. If the seizure of such book was unlawful as no portion of the policy game, which is not admitted, I do not think the same was error in view of the fact that the district supervisor for the Texas Unemployment Compensation Commission testified, and in connection with his testimony there was offered and introduced the quarterly reports to such commission of Frank Cagle,

a co-indictee with appellant, which reports showed that each of these writers, save one, was an employee of Frank Cagle. I find no objection to such proof, nor can I see how such an objection would have been tenable, especially in view of the testimony of such writers. The fact of the employment of these writers, and as to how this policy game was conducted became a material issue. These writers evidently had an employer who took the money, who arranged or supervised the drawings, and who gave notice of what numbers had been drawn. The writers, however, never saw the "Big Four" nor any of them. They had a secret manner in which they communicated with them. In these canvas bags, each with a recognized number, they would find certain written instructions as to their conduct in this game. Among such instructions, they find a request for each writer's social security number. Evidently upon a compliance therewith, we find Frank Cagle reporting to the Unemployment Commission the employment of such writer, giving the writer's social security number. Evidently this procedure had some weight as a circumstance to show that the writer was working for Frank Cagle. This circumstances connected with the association shown to have existed between Frank and his brother Rufus doubtless continued its influence in assisting the jury in finding them as acting together in the commission of this alleged offense. The testimony of the supervisor of the Unemployment Compensation Commission was unobjected to, so the record shows, and thus there appears in the record the same testimony unobjected to as was shown by the book that contained the names and social security numbers of the policy writers.

I therefore conclude that all implements, or things used in the playing of the game of policy that were seized under this warrant were admissible, such as the slips, bags, suit cases and printing press, as well as printed slips. If the book showing the names of employees was of but an evidentiary nature, then the same proof was brought in unobjected to from a proper source, and no complaint relative to the book is tenable.

It should be noticed that it was shown by these writers that they had never seen either appellant or his brother Frank Cagle; that the only dealings that they had with the Cagles, if any, was through the bags marked with their numbers and communications therein found. That in one of such communications they found a request for the giving of their Unemployment Compensation numbers, and that they complied with such request by placing same in such bags. That was the only method of communication, if such it be, with the heads of this policy game.

That this was of evidentiary value in connecting appellant with what was being done through the exchange of these bags, and their contents, I readily admit, otherwise the admission of such before the jury would have been a futile thing. This cause of necessity had to be tried upon circumstantial evidence, and again upon the law of principals, and any act of Frank Cagle's in furtherance of the common design would be the act of Rufus Cagle, and each would be charged with the same, provided it could be shown they were acting together.

I find from the record that it is shown therein that Frank Cagle was the owner of a certain business operated for amuse-'ment, and that he had 46 employees. I also find the names of ten of these writers who testified herein, listed as his employees, and the amount of wages paid each of them. There was also listed as an employee of Frank Cagle one Rufus Raymond Cagle, his social security number being 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, his salary $400.00 for the December 1941 quarter. This testimony came from the supervisor of the Texas Unemployment Compensation Commission, and there appears in the record no objection thereto. Under the rule that where improper testimony is admitted that is objected to, yet the same testimony is also admitted from a further source unobjected to, the error, if such there be, is rendered harmless. I think the fact of the finding of the social security numbers of the eleven writers in the black book would be a harmless error, if error at all, since such testimony is present in the record from other sources and no objection to the latter source appearing in the record.

I therefore respectfully enter my dissent herein.

## ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant and the State have each filed motions for rehearing. Appellant's motion is predicated on the renewed contention that the provisions of Title 6, Arts. 304, 305, 312, 316, C. C. P., and Art. 633 P. C., when considered together do not authorize a search warrant to search for implements used in operating a policy game. This question being one upon which the case largely hinged it had the most earnest attention and consideration of the court upon original submission. The conclusions expressed upon the point in the original opinion reflect the views of the court, as well as its commissioners. Appellant's motion will, therefore, be overruled.

378

In the State's motion for rehearing the attorneys for the State agree that the following statement in our original opinion is correct, viz:—

"However, if property was seized which was not used or usable in committing the offense but was only of evidential value in establishing accused's guilt of the crime charged, such evidence should, upon objection thereto, have been excluded."

However, the State insists that the principle stated should not be applied to evidence regarding the "Social Security numbers" found in appellant's residence because objection to evidence regarding them was included in objections to all other things found as a result of the search which were held to have been admissible. We regret that this feature of the bill was overlooked in disposing of the case originally. It is evident from the opinion that the court's mind was upon the general proposition being urged by appellant that none of the evidence regarding what was found in appellant's house was admissible upon the claimed invalidity of the search warrant, and the bill complained of the admission in evidence of *all* the property by virtue of said warrant. The rule which has always governed in such cases is succinctly stated in Sec. 211, p. 135, Branch's Ann. Tex. P. C. as follows:

"A bill of exception is too general to be considered if it includes a number of statements some of which are clearly admissible, and there is nothing in the objections to directly challenge or single out the supposed objectionable evidence."

To the same effect is the text in 4 Tex. Jur., Sec. 212, p. 305, with citation of some twenty-five more recent cases than those cited in Branch's Ann. P. C. (supra). In the brief supporting the State's motion we are particularly referred, among others, to Scogin v. State, 100 Tex. Cr. R. 389, 273 S. W. 575; Faulkner v. State, 104 Tex. Cr. R. 378, 283 S. W. 824; Ayres v. State, 104 Tex. Cr. R. 329, 283 S. W. 828; Autry v. State, 143 Tex. Cr. R. 252, 157 S. W. (2d) 924; Jowers v. State, 140 Tex. Cr. R. 458, 145 S. W. (2d) 593. Each of said authorities support the texts heretofore referred to.

Giving application to the rule stated calls for granting the State's motion for rehearing, setting aside the judgment of reversal, and directing the affirmance of the judgment of the trial court, which is now ordered.

ON APPELLANT'S MOTION FOR REHEARING.

GRAVES, Judge.

This case has demanded the joint efforts of this court since its submission, and the voluminous record has been gone over carefullly by a majority of the court. It was first reversed, with a dissent filed; upon the State's motion, the reversal was set aside and it was then affirmed, and it now appears on appellant's motion for a rehearing.

We have again gone over the record, and read with interest appellant's motion. We gather that appellant's first contention in such motion seems to be that because the statute denouncing the keeping or exhibiting of a policy game only denounces such an act upon the part of a person, that it means only natural persons; that it fails to denounce such acts upon the part of corporations, or artificial persons, and it therefore falls within the category of class legislation, and is void under the Fourteenth Amendment to the Federal Constitution because same discriminates in favor of corporations who might conduct a policy game.

We fail to follow him in his reasoning, which if carried to its ultimate conclusion would leave us without any method of punishment against the commission of the many felonies denounced by statute because of the fact that it would be impossible to confine a corporation in the penitentiary, or to punish same except by a pecuniary fine. We do not think the failure of Art. 619, P. C. to furnish a penalty against a corporation would amount to class legislation. In this instance we think that such a corporation is not of the same class as that denounced by Art. 619, P. C., and that therefore it could not be said that legislation that only punished natural persons was obnoxious because it failed to punish artificial persons for committing the same penal act.

Appellant complains because of the overruling of his motion to quash the indictment herein, the main ground thereof being because the indictment does not show in detail what constitutes a policy game, but merely uses those words in setting forth the herein charged offense.

In the case of Polk v. State, 154 S. W. 988, the indictment seems to be in the identical phraseology of the present indictment, and it was held to be sufficient, which holding is suported

by a list of authorities therein set forth; also see Schwarz v. State, 124 S. W. (2d) 392; also McKissick v. State, 2 Texas, 356, in which latter case Justice Wheeler said in substance that a charge that appellant "bet at a certain gaming bank then and there exhibited and kept, called Monte" was sufficiently descriptive of the offense inhibited by statute. In Short v. State, 23 Tex. App. 312, a charge for betting at a faro bank was held a sufficient allegation. Again, the Supreme Court held in Estes v. State, 10 Texas, 300, that a charge that accused bet at a gaming table at "rondo," that such charge was sufficient. We think the indictment was not subject to the motion to quash, but is in line with the authorities.

Appellant contends that the game shown by the evidence to have been operated was a lottery, and not a policy game. It is true, as mentioned by this court in the case of Canizares v. State, 157 S. W. (2d) 385, and in Schwartz v. State, 124 S. W. (2d) 392, that the winning numbers are usually decided by a drawing or lottery, but such is not a necessary method of ascertaining the winner. The lottery method might be used, or some other arbitrary method known possibly only to the keepers of the game, and the incidental mention by or idea of the policy "writers" would neither govern the class of game nor its name. "Policy" as used to designate a gambling game has achieved wide publicity and is known throughout the Union; a definition thereof is found in Vol. 22, Encyclopedia Americana, p. 303, as follows:

"Policy, the name given a lottery or gambling system; common in large cities. A combination of numbers like 4-11-44 is selected by the player who marks his numbers or 'guesses' on a slip or ticket, for which he pays a small sum. The lottery drawing of three numbers awards prizes to those persons having guessed correctly. A favorite or common combination of numbers is called a 'gig.' The person playing policy stands only a very small chance of winning a prize."

There is quite a difference in a lottery and a policy game; the lottery portion thereof, if used, is but an incident in determining what numbers appear, the identity of the numbers being the basis of the wager. We do not think the trial court was called upon to define a lottery to the jury in his charge. He did define a policy game, and we think that was sufficient.

Appellant now complains because of the fact that the search warrant herein is directed to the sheriff or any constable of Harris County, and he now says that same was executed by city

policemen of Houston. There appears nothing in the record preserving such error, if such there was, and his objection thereto now comes too late.

We have carefully read the portion of the court's charge relative to principals, and think that it is not subject to the objections leveled at same by appellant. To have gone further and singled out what association between the Cagle brothers would be necessary before appellant would be guilty as a principal would have borne upon the weight of the evidence, and been subject to objection thereto.

Appellant also complains because in the original opinion we failed to write on his bill of exception No. 7 which complaint relates to the reproduction of the testimony of John W. Moore, given upon a first trial of this cause. It was shown that Mr. Moore, who worked for a bank in Houston, was not with such bank at the time of this trial; that on April 1, 1942, he advised by card the assistant district attorney that his address was "John W. Moore, Seaman, Company Y-Z, Coast Guard Training Station, Eighth Naval District, Algiers, New Orleans, La." This card's signature was proven by a brother of Mr. Moore, who exhibited an envelope mailed on October 20th from Wilmington, California, in the handwriting of John W. Moore to his wife, who was soon leaving to join him in California. Appellant's objection to the reproduction of this witness' testimony shows, among other things, that the witness was in the Armed Forces of the United States, and had not established any permanent residence, but was only temporarily absent from the State.

The decision in the case of Cline v. State, 36 Tex. Cr. R. 320, held that it was necessary that an accused be confronted with the actual presence of the witness against him in all trials, it not being sufficient that the accused had once been thus confronted in the identical case with such witness, who was at the succeeding trial either dead or beyond the jurisdiction of the court. This case was very controversial in this court, and a vigorous dissent was written by one of the judges, but the doctrine laid down therein continued to be the law until the decision in the case of Porch v. State, 51 Tex. Cr. R. 7, 99 S. W. 1123. In that case a witness against Porch who was charged with hog theft had met his death shortly after such witness had testified in an examining trial as to such theft. This court then repudiated the decision laid down in the Cline case, and allowed the reproduction of the deceased's witness testimony

given in the examining trial. Soon thereafter in the case of Kemper v. State, 63 Tex. Cr. R. 1, 138 S. W. 1025, a special court overruled the Porch case, supra, and again returned to the doctrine set forth in the Cline case, supra. Again, in the case of Robertson v. State, 63 Tex. Cr. R. 216, 142 S. W. 533, this court in an exhaustive opinion, citing decisions not only from the Mother Country under similar circumstances but also from many states of the Union, restored the holdings prior to the Cline case in this jurisprudence, and we now find the doctrine "declared to be that when the testimony of a witness has been taken in the course of a judicial proceeding and the accused had the opportunity to cross-examine him then, and the witness dies, or becomes insane, or moves beyond the jurisdiction of the courts of this State, or is kept away by the wrongful acts of the person accused of crime in a subsequent trial, the testimony of such a witness can be introduced in evidence." We are of the opinion that the rule just above set forth is now the settled law of this State.

It was shown that the witness whose testimony was reproduced was without the jurisdiction of the court; that he had previously testified in person on a former trial of this matter, and had there confronted the appellant, who had an opportunity to cross-examine him, and under such rule and such circumstances his testimony was reproduced. We think the State was within its rights when it reproduced the testimony given upon the former trial.

Relative to the matter complained of in bill of exceptions No. 8, the question relative to what was the result of the first trial was answered, and it showed a mistrial,—the witness answering before any objection thereto was made. Immediately after the answer was given, an objection was made, and the State's attorney withdrew the question, and the trial court promptly instructed the jury to disregard both question and answer, and that same should not be discussed or considered by the jury. Upon a retirement of the jury, appellant moved for a mistrial, after having objected and excepted to the answer of the witness. It is deduced from the bill that on the voir dire examination of each juror they were asked if they had heard or read of any previous trial and the result thereof, and no member thereof answered that he had heard of the result of the prior trial. It will thus be seen that the jury already knew of a former trial, and we do not think that the casual mention of a hung jury, prior to an objection thereto, and eliminated promptly as soon as objected to, should result in a mistrial here-

of. If injury at all, it would seem to have been remedied by the careful trial court's prompt instruction.

In the original opinion wherein this cause was reversed many of the bills of exceptions were not discussed, nor was such discussion thought necessary to the final conclusion arrived at therein. However since this cause has taken the course in which it is now found, we have endeavored to discuss some of the matters presented in such bills. Again have we read the record and carefully considered all bills of exceptions, and we think the opinion of our Presiding Judge should settle this case, which granted the State's motion for a rehearing.

Therefore appellant's motion for a rehearing is overruled, thus leaving the judgment of the trial court affirmed, and it is so ordered.