JOE N. STEELE V. THE STATE.

No. 22654. Delivered June 21, 1944.
Rehearing Denied October 11, 1944.

The opinion states the case.

*E. T. Branch* and *William H. Scott,* both of Houston, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

HAWKINS, Presiding Judge.

Appellant was charged with keeping and exhibiting for the purpose of gaming a "policy game," on or about February 25, 1943. Upon conviction his punishment was assessed at 3 years in the penitentiary.

The "policy game" relied upon by the State was known as "Monte Carlo," and appears to have been operated and developed much the same as the policy game known as "Big Four," which was described in detail in the opinion in Rufus Cagel v. State, No. 22,490, finally disposed of June 7, 1944, but not yet reported. (Page 354 of this volume). Many of the legal questions raised in this case are the same as in Cagle's case (supra), and the decision in this case has been delayed until final disposition of that case in order to obviate discussion of the same question.

Thirteen witnesses testified for the State who characterized themselves as "writers" for "Monte Carlo" for various periods of time, and all of them being so engaged in the latter part of February, 1943. Two of the "writers" were women, and all of them were negroes, as were their customers. Bettors would select numbers, or various combinations of numbers, paying therefor; the "writers" made records thereof, giving one copy to the bettor and transmitted one to "headquarters." Two "drawings" were had each day, the bets on one closing about noon and the other about six o'clock in the afternoon. The results of the drawings were transmitted to the "writers" who in turn advised the bettors, exhibiting a printed slip showing the result from which the "writers" and bettors could tell whether the bettors had won on their selection of numbers. The "writers" would retain 20% of the bets recorded by them for their commission, and out of the money collected would pay any customers who had made a winning, designated as a "hit" on the former drawing; after deducting the commission and amounts paid on "hits" the writers would place the remainder of the money bet with them in an envelope together with the selection of numbers for the next "drawing" and send it in to "headquarters." The names of the "writers" did not appear on the envelopes, only the number by which the particular "writer" was designated. Each of the writers disclaimed knowledge of who was the "boss"—as some of them referred to the higher-ups—or where "headquarters" was located, or for whom they were working. The envelopes containing the money and numbers selected were sometimes delivered by one writer to another writer, and they were collected usually by some "negro" whom the writers professed not to know; the envelope showing the result of the drawing would not always be returned by the same party who picked them up, but in some way found their way into the hands of the proper "writers."

Herbert Pleasant was one of the "writers." On the day appellant was arrested Pleasant had his envelope in which were the money and designation of the bets on numbers. He went to

a certain barber shop and there a negro not known to Pleasant— so he claimed—handed him a brown paper bag which contained many envelopes and into which Pleasant put his envelope. He testified that someone unknown to him phoned him to place the bag in an automobile which would be parked at a certain place. He did put his bag in the car and took out of the same car another bag which contained many envelopes; these he intended to get to the various "writers," but as he was leaving the scene officers Thompson and Collins arrested him and took possession of the paper bag. No one was in the car when the exchange of bags was made. As quickly as the officers got Pleasant with his bag in their car they turned around and the car in which Pleasant had put the other bag was moving. It was driven by appellant (Steele). The officers followed him. He ran several red lights, but was overtaken by the officers who found in his car the bag left there by Pleasant. In the bag were the envelopes of Pleasant and the various other "writers" who testified. They identified their envelopes and the number selections recorded by them, all of which were put in evidence by the State. In this bag were a number of other envelopes in which were also numbers selected in the "Monte Carlo" game, but the State did not produce all "writers." The aggregate amount of money found in the bag left in appellant's car was $174.54. In the bag which Pleasant had taken out of the car were envelopes bearing the number of various "writers," and containing the printed result of the previous noon drawing.

Mr. Collins, one of the officers who arrested appellant, had been called into the army. leaving only officer Thompson who was a witness to appellant running the red lights, and as to finding the things in his car which were in evidence. The arrest of appellant was on February 25. On April 23 appellant phoned Thompson and made an appointment to meet him at the entrance to the Rice Hotel at 11:45. Thompson notified police headquarters and some other officers were assigned to be there or near there. Thompson and appellant did meet and after some preliminary talk appellant told Thompson that he was the only witness about appellant running the red lights and that if he, Thompson, would testify that he did not run the red lights appellant's arrest and search of his car would be illegal and that appellant could beat the "policy game" case. Thompson pretended to agree and appellant gave Thompson $250.00 to so swear. Thompson immediately signalled another officer and told him to arrest appellant. Thompson produced at this trial the $250.00, being twenty-five $10.00 bills which appellant had given him.

By bill of exception number three appellant brings forward complaint because the State was permitted to prove the attempt on the part of appellant to bribe officer Thompson to testify falsely, the objection being that it was proof of another offense. If an accused offers to pay a witness to give false evidence it is not error to admit proof of same. See Branch's Ann. Tex. P. C., p. 93, Sec. 162, under which a number of cases are cited, among them being Parks v. State, 46 Tex. Cr. R. 100, 79 S. W. 301; See also 18 Tex. Jur. p. 45, Sec. 26, and cases cited thereunder; also Heard v. State, 116 Tex. Cr. R. 328, 31 S. W. (2d) 435.

Appellant brings forward complaint in bill of exception No. 2 that the "writers" would have testified that "Monte Carlo" was a lottery, but that the State objected to such testimony on the ground that it would have been a conclusion of the witnesses. The objection was sustained, to which appellant reserved exception. Printed or multigraphed slips were in evidence showing the result of the drawing, and upon these slips were the words "Monte Carlo" and "Lottery Slips." The witnesses were also permitted to testify that they called the "Monte Carlo" game a lottery. The State's theory was that the enterprise or game of "Monte Carlo" as shown to have been conducted was a policy game. On the other hand, appellant's contention was that the game was a lottery. To have permitted the witnesses to say that the game was a lottery as appellant sought to have them testify would have been a legal conclusion of the witnesses, and would have practically taken away from the jury the very issue which they were to decide from the facts developed under proper instructions from the court. Appellant could no more bind the State by the opinion of witnesses that the game was a lottery than the State could bind appellant by opinions of witnesses that it was a policy game.

It is appellant's contention that the game in question was a lottery and not a policy game. Appellant did not testify and introduced no evidence whatever, so the evidence regarding the matter is undisputed. This same contention was made in Schwarz, v. State, 136 Tex. Cr. R. 260, 124 S. W. (2d) 392; Canizares v. State, 143 Tex. Cr. R. 76, 157 S. W. (2d) 385; Hill v. State, 143 Tex. Cr. R. 412, 158 S. W. (2d) 810; and in the recent case of Cagle v. State, No. 22,490, finally disposed of in this court on June 7, 1944. (Page 354 of this volume). It was held that while there may have been some elements of a lottery in the chance drawing of the winning numbers this did not prevent the transaction from being a "policy game" under its now

well accepted meaning. We see no reason for again entering upon a general review of the subject. We are referred to Howard v. State 49 Tex. Cr. R. 327, 91 S. W. 785. There accused was prosecuted for "establishing" a lottery "known as policy." The case was disposed of on the ground that the evidence was lacking to show that accused "established" a lottery. The question of whether it was lottery or policy was not discussed. Indeed, at the time said case was decided in 1905 the game of "policy" as so named was unknown to our Penal Code. It first received attention in 1907 when the Legislature amended what is now Art. 619 P. C., making it a felony to keep or exhibit for. the purpose of gaming certain named games and gaming devices generally. The first game named in said statutes as prohibited was "any policy game." At that time it was already an offense to establish a lottery or to dispose of property by lottery, and the Legislature apparently intended to distinguish the "policy game" from a lottery.

The record contains many objections to the court's instructions to the jury which were decided adversely to appellant in Cagle v. State (supra). The instructions in the present case were in many respects the same as in the case mentioned, and the objections the same. It is needless to write again upon the same subjects as we have not reached a different conclusion.

The court charged the jury that all persons are principals who are guilty of acting together in the commission of an offense, and also those who are present and know that an offense is being committed and aid by acts or encourage by words those who commit the offense; also, one is a principal who advises or agrees to the commission of an offense and is present when same is committed, etc.

Appellant objected to the charge upon principals because he contends the evidence did not raise the issue, and further, that the manner in which the issue was submitted gave undue emphasis to the question of principals.

The very manner in which the policy game here involved was conducted evidently caused the court to submit the various ways in which a party might become connected therewith as a principal. The offense did not consist of one act such as murder, burglary, arson or other crimes. It consisted of a series of acts, all culminating in the operation of the game. The bettors had to be obtained, and their selections of numbers recorded by the "writers"; these selections had to be transmitted to headquarters

—wherever that was—then the numbers for that particular "drawing" or game had to be selected and the result of such selections gotten back to the "writers" in order that they might settle with the winning bettors, if any. The evidence shows that appellant was the "go-between" who transmitted the bettor's selection of numbers and the money to headquarters, and the result of the appearance of the numbers back to the writers. He was a party to the conspiracy or scheme in the operation of the game. He was acting together with others in committing the offense.

Under the rather intricate method here employed in conducting and developing the game we think no undue emphasis on the question of principals arose from the manner in which the issue was submitted.

Discovering no errors upon which a reversal can properly be predicated, the judgment is affirmed.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

For the first time, and in a vigorous motion for a rehearing, appellant urges the insufficiency of the facts to sustain a verdict under the doctrine of circumstantial evidence.

It is shown by the evidence that none of the negro writers, save one, had ever known or seen appellant. That there was some mysterious concern called the "Monte Carlo" for whom they worked in what both the trial court and also this court denominated a "policy game," but all writers claimed not to know who was the boss, nor where he was located. The writer would receive some call over the phone and be told where to deposit his gatherings of each of the day's gains, and after making such deposit they would receive new supplies for the use in taking bets in the next drawing. Herbert Pleasant, one of the writers, was observed by two police officers, who were cruising from Commerce Street to Travis Street in the City of Houston, to have a package in his hand which, upon observing the officers, he dropped behind a lamp post. Upon being told to pick same up, he did so, and the officers looked therein and found paraphernalia that could be used in a policy game. Soon thereafter, while in company with Pleasant, the officers passed a car, a Mercury Coupe, backing out from the pavement on Travis Street. They followed this car, which accelerated its speed and passed through

three red traffic lights. The officers finally crowded this driver into the curb and found appellant therein driving the car. Upon a search of the car the unlocked glove compartment was found to contain many policy slips of the "Monte Carlo" policy game. In the meantime the appellant said nothing, which it was his right to so do. The books or slips were identified by these writers at the trial as having been made by them when taking bets for "Monte Carlo."

It is shown by the record that upon direct examination Pleasant identifies this car into which he had placed these policy slips as being a car in which he had previously placed into and taken from similar policy game paraphernalia, and upon cross-examination he refused to thus identify the car, thus causing a direct contradiction in his testimony. However, it was the province of the jury to decide in which one of the two contradictory statements the witness had told the truth, and in doing so they were privileged to have called to their assistance the presence of appellant at the time of arrest in order to aid them in solving this problem.

Again this appellant insists that the effort to bribe the arresting officer upon the proposition of running the red lights would evidence a consciousness of guilt in the cases filed or to be filed against appellant in the violation charged against the traffic laws, and that such act of bribery was foreign to any charge relative to the policy game, and therefore inadmissible. We do not think so. If, as appellant said, it could be shown that he was not guilty of the traffic violation, then his arrest therefor would have been illegal; the search thereafter also illegal, and the State would have been precluded from introducing the policy paraphernalia found in his car under such search. This would have doubtless resulted in the State failing to make out its case, and the acquittal of appellant in the policy game would doubtless follow, as he suggested to the police officer at the time of the proffered bribe in the following language:

"When I told Mr. Steele that I had already testified before the Grand Jury he said if he beat the red light case in traffic court this case would probably be thrown out of court; he said the policy case." He further testified: ". . . if I would not say he had run a red light, since Mr. Collins is in the army, then we wouldn't have a legal search of the car and the policy case would be thrown out."

We think such an effort to bribe was connected with the policy game case, and no error is found in its introduction herein, the final motive being an effort to influence the result in the policy game trial.

We adhere to the views expressed in the original opinion, and the motion is therefore overruled.